**IN the INTEREST OF S.J.R.-Z., J.C.Z., A.R.Z., L.L.L., K.K.H., and J.G.H. III, Minor Children**

No. 04-17-00238-CV

Court of Appeals of Texas, San Antonio.

Delivered and Filed: December 20, 2017

---

54. *See* Tex. R. Civ. P. 278.

Manuel Charles Rodriguez Jr., Manuel C. Rodriguez Jr., Attorney at Law, Gerald Anthony Uretsky, San Antonio, TX, for Appellant.

Andrew Warthen, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: Sandee Bryan Marion, Chief Justice, Patricia O. Alvarez, Justice, Luz Elena D. Chapa, Justice

### OPINION ON MOTION FOR REHEARING

Opinion by: Patricia O. Alvarez, Justice

On August 9, 2017, this court issued an opinion and judgment in this appeal and the Texas Department of Family and Protective Services filed a motion for rehearing. We grant the motion, withdraw our previous opinion and substitute this opinion in its stead.

This is an accelerated appeal of the trial court's order terminating Appellant Mom's parental rights to her children, S.J.R.-Z., J.C.Z., A.R.Z., L.L.L., K.K.H., and J.G.H. III, and Appellant Dad's parental rights to K.K.H. and J.G.H. III. In both appeals, Mom and Dad contend (1) the evidence does not support the trial court's termination based on Texas Family Code subsections 161.001(1)(b)(D), (E), and (O), *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (*O*) (West Supp. 2016), and (2) the evidence is neither legally nor factually sufficient for the trial court to have found by clear and convincing evidence that terminating Dad's parental rights was in K.K.H.'s and J.G.H. III's best interests, and that terminating Mom's parental rights was in the best interests of her children, *see* TEX. FAM. CODE ANN. § 161.001(b)(2). We affirm the trial court's judgment.

### FACTUAL BACKGROUND

On August 10, 2015, the Texas Department of Family and Protective Services received a referral for neglectful supervision following the birth of J.G.H. III, who tested positive for marijuana. Mom admitted drug usage while pregnant. The Department attempted to work with Mom in Family Based Safety Services; however, Mom provided false information in an attempt to mislead the Department. On October 1, 2015, following a home visit, the Department determined the children's safety required removal based on Mom's failure to comply with the safety plan.

On October 20, 2015, the Department filed its Original Petition for Protection of Children, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. Following an emergency order, the children were placed in the temporary managing conservatorship of

the Department. Mom and Dad were ordered to comply with each requirement set out in the Department's service plan during the pendency of the suit. Both Mom and Dad were granted visitation with the children.

On November 13, 2015, the Department filed individual family service plans for Mom and Dad; the plans set forth the services and classes required before the children could return home to either Mom or Dad. After several status and permanency hearings, on February 21, 2017, the trial court called the matter for trial. Although Dad was not present for the first day of the hearing, he testified during the second day.

Following a hearing, the trial court terminated Mom's and Dad's parental rights based on the following:

(1) **Mom**: the trial court terminated Mom's parental rights to S.J.R.-Z., J.C.Z., A.R.Z., L.L.L., K.K.H., and J.G.H. III pursuant to Texas Family Code Section 161.001(b)(1)(*O*), *see id.* § 161.001(b)(1)(*O*), and the trial court further found termination of Mom's parental rights was in the S.J.R.-Z.'s, J.C.Z.'s, A.R.Z.'s, L.L.L.'s, K.K.H.'s, and J.G.H. III's best interests, *see id.* § 161.001(b)(2); and

(2) **Dad**: after being served with citation, Dad failed to file an admission of paternity or counterclaim for paternity under Chapter 160 of the Texas Family Code, *see id.* § 161.002(b)(1); Dad failed to comply with Texas Family Code Section 161.001(b)(1) (*O*), *see id.* § 161.001(b)(1)(*O*), and termination of Dad's parental rights was in K.K.H.'s and J.G.H. III's best interests, *see id.* § 161.001(b)(2).

This appeal ensued.

We turn first to the Department's contention that Dad's failure to challenge an independent ground in support of the trial court's ruling is dispositive of his appeal.

FAILURE TO ASSERT PATERNITY

Following the termination hearing, the trial court's order of termination includes the trial court's finding that,

> by clear and convincing evidence [ ], after having waived service of process or being served with citation in this suit, [Dad] did not respond by timely filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit.

*See* TEX. FAM. CODE ANN. § 161.002(b)(1); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.) (section 161.002(b)(1) permits trial court to summarily terminate alleged father's parental rights where he fails to assert his paternity).

The evidence is undisputed that Dad was not listed on either K.K.H.'s or J.G.H. III's birth certificate, and he never signed a statement acknowledging paternity of either K.K.H. or J.G.H. III. The Department argues this court need look no further than the trial court's determination regarding Dad's failure to establish paternity.

This court previously held, "[t]here are no formalities that must be observed when filing an admission of paternity or for such an admission to be effective." *In re J.L.A.*, No. 04-13-00857-CV, 2014 WL 1831097, at *2 (Tex. App.—San Antonio May 7, 2014, no pet.) (mem. op.); *accord In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *3 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.). "In fact, by appearing at

trial and admitting that he is the child's father, an alleged father triggers his right to require the Department to prove one of the grounds for termination under section 161.001(1) and that termination is in the best interest of the child." *J.L.A.*, 2014 WL 1831097, at *2.

Here, Dad appeared at trial and testified that he was K.K.H. and J.G.H. III's father. In addition, Dad's trial counsel maintained that Dad was K.K.H. and J.G.H. III's father, and counsel advocated against termination of Dad's parental rights. *See id.* (citing *Toliver v. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding the trial court erred in terminating parental rights under section 161.002(b)(1), when the alleged father appeared at trial, asserted paternity, and opposed the termination of his parental rights)). Accordingly, we conclude that Dad's appearance and participation in the trial court, including his sworn admission that he was K.K.H. and J.G.H. III's father, was sufficient to trigger his right to have the Department prove one of the grounds for termination listed in section 161.001(b)(1).

The trial court's judgment sets forth the basis for termination. In addition to the statutory findings pursuant to Texas Family Code section 161.001(b)(1)(*O*) (failure to complete the court-ordered service plan), *see* Tex. Fam. Code Ann. § 161.001(b)(1)(*O*), and the trial court's finding that termination of Dad's parental rights was in K.K.H. and J.G.H. III's best interests, *see id.* § 161.001(b)(2), the trial court also found, by clear and convincing evidence, that Dad failed to timely file an admission of paternity or counterclaim for paternity under Chapter 160 of the Texas Family Code, *see id.* § 161.002(b)(1). On appeal, Dad only challenges the trial court's findings as to the statutory viola-

tions of his failure to comply with the court-ordered service plan and the trial court's best interests findings; Dad does not raise an appellate challenge to the trial court's finding that Dad failed to file an admission of paternity.

An appellant must challenge all independent bases or grounds that fully support a judgment or appealable order. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 650 (Tex. App.—Dallas 2015, no pet.); *Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681–82 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also In re N.L.D.*, 412 S.W.3d 810, 818 (Tex. App.—Texarkana 2013, no pet.) (holding that when a parent failed to challenge on appeal a ground for termination of parental rights, the court could affirm on the unchallenged ground without examining the sufficiency of evidence to support challenged grounds); *In re Elamex, S.A. de C.V.*, 367 S.W.3d 879, 888 (Tex. App.—El Paso 2012, orig. proceeding) ("If the appellant fails to challenge all possible grounds, we must accept the validity of the unchallenged independent grounds and affirm the adverse ruling."). The requirement that an appellant challenge each independent ground "is based on the premise that an appellate court normally cannot alter an erroneous judgment in favor of an appellant in a civil case who does not challenge that error on appeal." *Britton*, 95 S.W.3d at 681.

By failing to raise an appellate challenge to the trial court's finding that Dad failed to file an admission of paternity, Dad failed to challenge all of the independent grounds listed in the termination order. Accordingly, this court must accept this unchallenged finding as true and we affirm the trial court's order as to Dad's

termination of his parental rights.[1] *See id.*; *N.L.D.*, 412 S.W.3d at 818; *Elamex*, 367 S.W.3d at 888.

Because termination under Texas Family Code section 161.002(b)(1) does not require proof that termination is in the best interests of the children, *see* TEX. FAM. CODE ANN. § 161.002(b)(1), we turn to the trial court's involuntary termination of Mom's parental rights pursuant to section 161.001(b)(1)(O) of the Texas Family Code, *see id.* § 161.001(b)(1)(O).

### SUFFICIENCY OF THE EVIDENCE

**A. Standards of Review**

◼ "Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent. *Id.* (citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.)).

An order terminating parental rights must be supported by clear and convincing evidence that (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(b)(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2003). " 'Clear and convincing evidence' means the measure or degree of proof that

will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *J.F.C.*, 96 S.W.3d at 264.

◼ "There is a strong presumption that the best interest[s] of the [children are] served by keeping the child[ren] with [their] natural parent, and the burden is on [the Department] to rebut that presumption." *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "The same evidence of acts or omissions used to establish grounds for termination under section 161.001[ (b) ](1) may be probative in determining the best interest[s] of the child[ren]." *Id.*

*1. Legal Sufficiency*

◼ When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *J.F.C.*, 96 S.W.3d at 266). If the court "determines that [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally [sufficient]." *See id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbe-

---

1. We note our finding of appellate waiver does not change this court's prior holdings that a father's appearance at trial and admission that he is the child's father "triggers his right to require the Department to prove one of the grounds for termination under section 161.001(1) and that termination is in the best interest of the child." *J.L.A.*, 2014 WL 1831097, at *2.

lieved or found to have been incredible."
*Id.*

### 2. Factual Sufficiency

 Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *accord In re K.R.M.*, 147 S.W.3d 628, 630 (Tex. App.—San Antonio 2004, no pet.). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266; *accord C.H.*, 89 S.W.3d at 25. "If, in light of the entire record, [unless] the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, ... the evidence is factually [sufficient]." *J.F.C.*, 96 S.W.3d at 266.

## B. Testimony Elicited during the Termination Hearing

The trial court terminated the parental rights of each of the different fathers. We, therefore, limit the facts to the necessary witnesses to Mom's involvement with the Department.

### 1. Department Employees and Service Providers

#### a. Cecilia Ramirez

Cecilia Ramirez, an investigator for the Department, testified she received the referral in August of 2015, for negligent supervision; J.G.H. III was born with marijuana in his system. At the time, Ramirez reported three major areas of concern: Mom admitted using marijuana during her pregnancy, Mom and Dad had a dispute and he tried to run her over with his vehicle, and Mom's mental stability—"she did tell me she felt overwhelmed with the children and couldn't handle them all." Ramirez and the Department implemented a safety plan wherein Mom's friend, Abigail Gonzalez, would remain in the house with the children. At the time of the removal, Mom's six-year-old son, J.C.Z., was residing with the maternal grandmother. The Department, however, subsequently removed the child for negligent supervision related to grandmother's methamphetamine use.

#### b. Kathleen Batteen

Kathleen Batteen was the original Department caseworker. Batteen testified the family was very evasive. Her first visit to the home, on October 15, 2015, occurred approximately five weeks after J.G.H. III's birth. During the visit, Mom and Dad both admitted marijuana use in the home. Mom described her relationship with Dad as "contentious" and told Batteen "[she] and Dad got into an argument outside and he almost ran her over with a car." Mom further "made admission of multiple personality and depression.... [I]n September [of 2015] she was admitted for suicidal ideations."

When asked about the state of the children, Batteen testified that S.J.R.-Z. was at school at the time of her home visit. Batteen testified the home was infested with bed bugs and the children were covered in bug bites and head lice. One-month-old J.G.H. III was in his swing, "he was not buckled while he was in his swing and he was an infant and had a bottle in his mouth. So he was unable to move his face if—if he was choking." Fourteen-month-old K.K.H. was carrying a bottle around the house and had a full diaper. Batteen noted that K.K.H. appeared to have developmental delays and was still unable to walk.

Four-year-old A.R.Z. and two-year-old L.L.L. were running around the home, and also had full diapers. Mom acknowledged used of methamphetamines, marijuana, and opiates during her pregnancy with A.R.Z. and Batteen expressed concern regarding the possibility of developmental delays.

Batteen testified about concerns for domestic violence, substance abuse, mental health issues, and the physical care of the children, resulting in the children's removal. K.K.H. and J.G.H. III, the two youngest children, were placed with a relative; the other three children were placed with their maternal aunt. The safety plan for the two youngest children only lasted for a couple of days; the relative dropped them off at the Department stating she was unable to continue caring for the children. The Department subsequently placed the two children in a foster home, where they remained during the pendency of the case.

### c. Martha Suarez

Martha Suarez was the legal caseworker until the end of August of 2016. Suarez testified that after the children's removal, she personally explained the safety plan to Mom. According to Suarez, Mom completed several of the classes; she reported for some of the drug tests, but proffered a plethora of excuses for others. Yet, even in light of the classes, Suarez testified that Mom was unable to practice the parenting techniques in her visitations. Mom was flustered and could not handle the children. When asked for specifics, Suarez explained that Mom would yell at the children and "parent from the chair;" she did not engage with any of the children; she would sit down and yell at J.C.Z., S.J.R.-Z., and L.L.L.; and she never spoke to them or asked them about their lives.

Suarez further described Mom having the older children care for the younger children. Mom relied on S.J.R.-Z. to retrieve the necessary diapers or bottles. When given a five-minute notice at the end of the visit, Mom would instruct "S.J.R.-Z. go clean this. J.C.Z., get your sister. J.C.Z., go pick up the trash over there. She wouldn't—she would just be overwhelmed." Suarez testified that she tried to provide direction, but Mom did not take her advice.

In August of 2016, ten months after the children's removal, Suarez did not believe Mom was capable of caring for the children. Mom lost her subsidized housing and was going to have to start paying rent and she was pregnant with her eleventh child.

### d. Jarred Moore

Department caseworker Jarred Moore began working with Mom in August of 2016. Moore testified that he immediately attempted to address Mom's difficulty controlling the children's behavior. Moore arranged for in-home parenting classes to assist in teaching Mom how to maintain the children's behavior during the day and to create routines for the children.

During Moore's initial meeting with Mom, he discussed her inconsistency with individual counseling and visitation with her children. At one point, Mom missed four consecutive weeks. Moore testified that he tried to accommodate Mom's work schedule or other conflicts, but Mom simply did not make an effort. Once again, Moore testified that Mom always had an excuse—Dad would not give her the money for the bus or Dad would not take her.

In October of 2016, S.J.R.-Z. and L.L.L. were placed back in Mom's home. Moore explained that Mom completed many of her services and the Department wanted to provide her an opportunity to show that she could maintain the children on her own. Moore arranged for eighteen weeks

of in-home classes for Mom beginning in mid-December; yet, after only a couple of weeks, Mom failed to continue with the classes. Moore testified that he had several conversations with Mom regarding her lack of compliance with her service plan. In fact, he visited Mom's home weekly; reminded them of services that they needed to complete, and discussed the children's needs.

Moore explained that he instructed Mom to continue six-year-old S.J.R.-Z.'s therapy. Prior to the Department's attempted reunification, S.J.R.-Z. attended weekly therapy. Per Mom's request, Moore arranged for S.J.R.-Z.'s continued therapy at Strictly Therapy. Yet, during the three months in Mom's care, Mom never arranged appointments or took S.J.R.-Z. for counseling. Moore also testified that three-year-old L.L.L. was supposed to be receiving speech therapy. Once again, Moore provided Mom with all of the information for L.L.L.'s service; but Mom failed to schedule appointments or take L.L.L. for the necessary therapy.

Moore testified that he specifically instructed Mom that, due to methamphetamine use, the children were not allowed at the maternal grandmother's home. He explained that Mom could visit her mother, but the children could not be present. Yet, the children were consistently located or reported to be at the maternal grandmother's residence.

Moore further testified that, in the short time the children were in Mom's home, S.J.R.-Z. missed approximately fifteen days of school. Mom explained the missed days were the result of moving. Mom removed S.J.R.-Z. from her elementary school, but failed to reenroll her at another school. Moore testified he arranged for S.J.R.-Z. to be reenrolled at the school she had been attending, but Mom failed to follow through.

Moore testified that when S.J.R.-Z. and L.L.L. were removed from the home in January of 2017, the children appeared dirty and they were hungry; it was eight o'clock in the evening and the children had not yet eaten dinner. Moore relayed he took the girls to McDonald's on their way to placement.

With regard to placement, Moore testified that J.C.Z. was residing at Guiding Light, a residential treatment center where he was receiving specialized treatment for outward sexual behavior toward his siblings and other individuals. Moore did not believe that Mom could meet J.C.Z.'s needs. J.C.Z. was in the process of transitioning to live with a relative; J.C.Z. had met the relatives and would be the only child in the home.

L.L.L. actually has two different relatives that are willing to raise her and Moore was working on the placements.

A.R.Z.'s father had been incarcerated since 2008 for an assault on Mom; his release date was scheduled for March 25, 2021. A.R.Z.'s paternal grandmother, with whom he was currently living, was willing to raise him. A.R.Z. was doing better in school and he was receiving the therapy that he needed. Additionally, A.R.Z. was taking medication for his ADHD. A.R.Z. has also acted out sexually, touching both his grandmother and brother inappropriately; the grandmother reports his behavior has improved with the medication.

S.J.R.-Z. was in the process of being placed with her biological father's sister until the Department has had an opportunity to work with her biological father on services.

Moore recommended the trial court terminate Mom's parental rights to each of the children involved in the case. He further testified that termination of Mom's parental rights was in the best interest of

each of the children. Moore opined that Mom has been given several opportunities to complete services and classes; he believed that he and the Department went above and beyond; he spoke to Mom late at night; he went to the house weekly; he talked to her on the phone; and he texted her. Mom simply refused to take action to have her children returned to her care or to implement the safety plan or directions of the Department.

### e. Lorraine Shipmon

Lorraine Shipmon, a fraud investigator with the San Antonio Housing Authority, testified that she received a report that the Department had removed the children from the home. In August of 2015, Mom failed to report the change in her housing needs as required by the Housing Authority. The report also indicated that Dad, an unauthorized tenant, was living in the home and there was evidence of drug use. Shipmon sent Mom a letter of intent to terminate, which provided Mom an opportunity to explain or contest the Housing Authority's findings; Mom did not respond. The Housing Authority terminated Mom's assistance on August 31, 2016.

### f. Luvia Coruna

Luvia Coruna, the manager at the Cielo Apartment complex, testified that Mom failed to make the rent payments in November and December of 2016. Although the complex generally evicts tenants after missing rent for one month, Coruna testified that she really tried to work with Mom. The complex served the eviction notice on January 3, 2017, and Mom moved out on January 12, 2017.

### g. Sarah Quintanilla

Sarah Quintanilla, an investigator with the Department, received a report on January 10, 2017, regarding medical neglect of S.J.R.-Z. When Quintanilla met with Mom, S.J.R.-Z.'s prescription bottle was empty. Mom opined that "while they were removing their belongings from one place to another that the pill bottle must have been opened and the pills fell out." Quintanilla was also concerned about S.J.R.-Z. missing an excessive number of school days. Quintanilla finally located Mom and the children at the maternal grandmother's residence. Mom insisted they were not staying there, but that they were staying with an aunt; Mom would not provide the address.

On January 31, 2017, the Department removed S.J.R.-Z. and L.L.L.; Quintanilla staffed the case and the Department subsequently moved for removal of two-month-old J.R.Z., the child born during the pendency of this case and not part of these proceedings. When Quintanilla arrived at the apartment, she asked Mom to open the refrigerator and there was no food. Quintanilla reported the refrigerator was completely empty; it was concerning because S.J.R.-Z. and L.L.L. had stayed the night before; J.R.Z. did not have a crib and she was sleeping in a car seat.

### h. Janisa Hodges

Janisa Hodges, the department supervisor with Child Protective Services, testified she supervised this case beginning in August of 2015. Originally, the Department's primary concern was the stability of the parents' relationship and their ability to meet the children's needs. Hodges testified that Mom does not have the financial means to support the children; she is completely dependent on Dad for rent and food. This relationship creates problems because one minute Dad is supportive and the next he is not.

At the beginning of the case, Mom received housing assistance; but the Housing Authority terminated her assistance due to fraud. As a result, Mom's rent escalated

from \$50.00/month to \$990.00/month. Mom did not have a steady job; she had insufficient funds to keep a roof over the children's heads or to meet their basic needs. After Mom lost her housing, she falsely reported that she was making rent payments; the complex eventually evicted her. However, because Mom was not qualified to receive further housing assistance, there were no funds available to pay the rent. After only making one or two rent payments, the complex evicted Mom for failure to make rent payments in November or December, 2016.

Hodges also expressed concerns about Mom's ability to manage all six children. When S.J.R.-Z. and L.L.L. were returned to Mom's care, a safety plan was enacted that provided for Lydia, a relative, to help with the children. The plan specifically allowed for Lydia to assist, but only at Mom's house. Hodges testified that each of the caseworkers was very clear the children were not to be at the maternal grandmother's home because J.C.Z. had already been removed for methamphetamine use in the home.

Hodges also expressed concern regarding S.J.R.-Z.'s attendance at school. The Department placed the two girls in Mom's care on October 15, 2016; the Department removed the girls for a second time on January 31, 2017. During that time, the children were out of school for both Thanksgiving and winter break and S.J.R.-Z. still missed at least fifteen days of school during that period. Hodges also testified that L.L.L. was not attending the necessary speech therapy appointments. When asked, Mom insisted she was trying to set up the appointments, but Hodges testified that Mom never arranged the appointments.

Hodges further testified that Mom had been involved with the Department since 2006, over ten years. The children involved in this case were continuously involved with the Department for their entire lives; they have not had any normalcy or permanency in their lives. Mom's lack of a support system was very problematic; Mom was unable to provide names of family members the Department could approve to assist in the children's care. Additionally, the Department was very clear that the children were not to be at the maternal grandmother's house, but Mom continued to take the children to her mother's home.

Hodges recommended the trial court terminate Mom's parental rights. Mom failed to demonstrate the ability to care for the children; she has not provided a period of consistency which would suggest her inability to do so in the future; the children have not had any stability in their lives; and Mom cannot meet even their basic needs, much less their developmental needs. K.K.H. and J.G.H. III, along with the newborn, who is not a part of the suit, were in a foster-to-adopt home that had expressed a willingness to adopt all three children and willingness to maintain contact with the siblings. After the recent completion of a home study, J.C.Z. was transitioning into a relative placement. A.R.Z. was placed with his paternal grandmother, who is willing to adopt him. S.J.R.-Z.'s paternal aunt came forward and the Department was in the process of completing the home study. Finally, for L.L.L., the maternal aunt, and adoptive parent to another one of Mom's children, came forward and agreed to take L.L.L. and move toward adoption.

### i. Carolyn Jurecko

Carolyn Jurecko, a licensed professional counselor, testified that she had been working with Mom since November of 2015. Mom admitted prior marijuana use, but was apparently drug free. Jurecko also testified that Mom completed her services,

and although she has a history of domestic violence going back to 2007, it was not currently Jurecko's major concern. Jurecko expressed concerns regarding Mom's financial instability. She did not believe Mom could care for all six children. Mom showed difficulty with bonding and attachment to both K.K.H. and J.G.H. III. Mom's relationship with her children was very chaotic; although Jurecko believed she exhibited a bond with S.J.R.-Z. and L.L.L., she did not engage with all of the children. Jurecko also expressed concern regarding Mom's refusal to follow the Department's mandate that she not take the children around the maternal grandmother.

Jurecko testified that Mom missed several counseling appointments due to her pregnancy. Mom's reasons for inconsistency varied: she did not have money, she did not have a ride, the doctor told her she cannot attend due to pregnancy, or Dad was unwilling to bring her. Jurecko also testified that this case has been pending for almost eighteen months and the two youngest children were very bonded to their foster parents and had not formed a bond with Mom.

### j. Ida Lopez

Ida Lopez, a parent educator for Family Services Association, testified that she received a referral to provide in-home parenting classes for Mom beginning on December 14, 2016. Mom attended three sessions out of eighteen, but Lopez had not heard from Mom since January 4, 2017.

### 2. Family Members

#### a. Mom

Mom testified she was the mother of eleven children, six of whom were at issue in this proceeding. Mom's children who are not involved in this case include: J.S., ten-year-old male, and F.S., nine-year-old female, live with their biological father; M.[E].Z., seven-year-old female, adopted by a non-relative caregiver; and M.[A].Z., three-year-old female, was in the process of being adopted by Mom's sister.

At the time of the removal, six of Mom's children were involved in this case. Five of the children were living with Mom and Dad: S.J.R.-Z., seven-year-old female, A.R.Z., four-year-old male, L.L.L., two-year-old female, K.K.H., one-year-old female, and J.G.H. III, two-month-old male. Additionally, J.C.Z., six-year-old male, was living with the maternal grandmother. During these termination proceedings, Mom became pregnant, and on December 1, 2016, she gave birth to a little girl, J.R.Z. The Department removed J.R.Z when she was only two-months-old.

Mom testified that she and Dad were living together as co-parents in a three-bedroom, two-bath townhome. Mom testified that she completed her service plan; she completed the drug class, the anger management class, the domestic violence class, and a parenting class. According to Mom, the only remaining issue was the individual therapy sessions.

Mom testified that S.J.R.-Z. and L.L.L. were returned to her custody on October 7, 2016. She averred that S.J.R.-Z. only missed school for doctor appointments. In January of 2017, the Department removed the children again. Mom acknowledged her biggest issue was keeping a roof over the children's heads. Mom further testified that she was expecting a large tax refund and that she would be able to purchase items for the children. When asked, Mom conceded that she claimed all seven children even though none of the children were in her care between October of 2015 and October of 2016.

#### b. Joe S.

Joe S. is the biological father of Mom's two oldest children. Joe testified F.S. and J.S. have been in his custody since they were one-year-old and two-years-old, respectively. He testified that, at the beginning, Mom saw the children. Joe further explained Mom saw the children approximately five times, but when the children indicated they did not want to go back to her house, the visits stopped. Joe testified that Mom had not seen the children in over a year and a half.

### TERMINATION BASED ON STATUTORY VIOLATION

### A. Statutory Violations under the Texas Family Code

■ The trial court found that Mom failed to comply with the provisions of a court order under section 161.001(b)(1)(O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Section 161.001(b)(1)(O) allows termination of the parent-child relationship when a parent has failed to satisfy the conditions of her Family Service Plan. *See id.* Specifically, a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that a parent has:

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.*

■ "Texas courts generally take a strict approach to subsection (O)'s applica-

tion." *In re C.A.W.*, No. 01-16-00719-CV, 2017 WL 929540, at *4 (Tex. App.—Houston [1st Dist.] Mar. 9, 2017, no pet.) (mem. op.) (citing *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.)); *accord In re A.M.M.*, No. 04-15-00638-CV, 2016 WL 1359342, at *3 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (mem. op.). The burden of complying with the court order is on the parent. *See D.N.*, 405 S.W.3d at 878. Courts do not measure the "quantity of failure" or "degree of compliance." *Id.* at 877. Subsection O does not provide a means to evaluate "excuses" or "partial compliance." *Id.*; *see also In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (holding subsection (O) does not intend evaluation of parent's partial achievement of plan requirements); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied) (holding any excuse for failure to complete family service plan is only relevant to best interest determination). In other words, "substantial compliance is not the same as complete compliance." *A.M.M.*, 2016 WL 1359342, at *3.

### B. Arguments of the Parties

Mom contends that absent completion of her parenting classes, she completed all of the tasks contained within the Department's service plan. Specifically, Mom argues she completed the drug abuse classes, anger management classes, domestic violence classes, and parenting classes. She also attended individual therapy and maintained full-time employment for the three-months prior to the hearing.

### C. Analysis

■ While it is undisputed that Mom completed certain classes in her family service plan, she failed to complete all of the tasks called for in the court-ordered plan. Although Mom attended the classes,

she failed to exhibit an ability to implement the lessons learned. The evidence is undisputed that Mom failed to obtain stable housing or visit the children regularly as required by the Department's service plan. Mom acknowledged during her testimony that she failed to complete her individual counseling or her in-home parenting classes, both requirements of her service plan. Even further, despite constant warnings, Mom continued to allow the children to be at the maternal grandmother's residence. Department representatives testified that Mom regularly offered excuses for her failure to comply with Department requirements. Section 161.001(b)(1)(O) does not "make a provision for excuses" for the parent's failure to comply with the court-ordered services. *See J.S.*, 291 S.W.3d at 67 (quoting *T.N.F.*, 205 S.W.3d at 631).

■ "It is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.;* No. 07-09-0101-CV, 2009 WL 4348760, at *6 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.). Here, the trial court was free to believe the Department's witnesses over Mom. The Department presented clear and convincing evidence the children's removal was due to abuse or neglect and that the children had been in the Department's care for over nine months. Substantial or partial compliance by Mom is insufficient to stave off termination. *See A.M.M.*, 2016 WL 1359342, at *9.

Reviewing all of the evidence in the light most favorable to the termination findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination finding under subsection (O). *See J.F.C.*, 96 S.W.3d at 266. Consequently, we hold that the evidence is legally and factually suffi-

cient to support the trial court's finding under Section 161.001(b)(1)(O). *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(O); *J.F.C.*, 96 S.W.3d at 278 ("[S]poradic incidents of partial compliance do not alter the undisputed fact that the parties violated many material provisions of the trial court's orders.").

## BEST INTERESTS FINDINGS

### A. Arguments of the Parties

Mom contends the evidence before the trial court was insufficient to overcome the presumption that keeping the children with a parent is in the children's best interests.

### B. The *Holley* Factors

■ The trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (requiring appellate deference to the factfinder's findings); *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Some factors used to ascertain the best interest of the child were set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *accord In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors). The *Holley* Court warned that "[t]his listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Holley*, 544 S.W.2d at 372; *accord E.N.C.*, 384 S.W.3d at 807 (describing the Holley factors as nonexclusive). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89

S.W.3d at 27. In fact, evidence of only one factor may be sufficient for a factfinder to reasonably form a firm belief or conviction that termination is in a child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *See id.*

In addition to consideration of the *Holley* factors, courts remain mindful that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016); *In re B.R.*, 456 S.W.3d 612, 615 (Tex. App.—San Antonio 2015, no pet.). There is also a strong presumption that keeping children with a parent is in the children's best interests. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In determining whether a parent is willing and able to provide the children with a safe environment, courts should consider the following statutory factors set out in section 263.307(b) of the Code, which include the following:

(1) the children's ages and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the children;

(4) whether the children have been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the children are fearful of living in or returning to the home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the children's parent, other family members, or others who have access to the home;

(7) whether there is a history of abusive or assaultive conduct by the children's family or others who have access to the home;

(8) whether there is a history of substance abuse by the children's family or others who have access to the home;

(9) whether the perpetrator of the harm to the children is identified;

(10) the willingness and ability of the children's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the children's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the children's family demonstrates adequate parenting skills; ... and

(13) whether an adequate social support system consisting of an extended family and friends is available to the children.

TEX. FAM. CODE ANN. § 263.307(b); *see In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (citing *In re A.S.*, No. 04-14-00505-CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.)); *B.R.*, 456 S.W.3d at 616.

When determining the best interests of the children, a court "may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *B.R.*, 456 S.W.3d at 616 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). A factfinder may also measure a parent's future conduct by his or her past conduct to aid in determining whether termination of the parent-child

relationship is in the best interests of the children. *Id.* Finally, the grounds on which the trial court granted termination, pursuant to section 161.001 of the Code, "may also be probative in determining the child[ren]'s best interest[s]; but the mere fact that an act or omission occurred in the past does not ipso facto prove that termination is currently in the child[ren]'s best interest[s]." *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (citation omitted).

### 1. Desires of the Children

■■■■■ The children were between the ages of one-year-old and seven-years-old. None of the children testified during the hearing. As stated by the Fourteenth Court of Appeals, "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mom's individual counselor testified that Mom had failed to bond with either K.K.H. or J.G.H. III. No evidence indicates any of the other children expressed a desire to return to either their mother's or their father's care. *See* Tex. Fam. Code Ann. § 263.307(b)(13); *Holley*, 544 S.W.2d at 371–72; *see also C.H.*, 89 S.W.3d at 28 (holding placement plans and adoption evidence are relevant to best interest determination).

### 2. Emotional and Physical Needs of the Child Now and in the Future and the Emotional and Physical Danger to the Child Now and in the Future

■■■■ "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *Dupree v. Tex. Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). This court considers a parent's conduct before and after the Department's removal of the children. *See In re S.M.L.D.*, 150 S.W.3d 754, 758 (Tex. App.—Amarillo 2004, no pet.). Additionally, the children's young ages render them vulnerable if left in the custody of a parent who is unable or unwilling to protect them or attend to their needs. *See* Tex. Fam. Code Ann. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72; *In re J.G.M.*, No. 04-15-00423-CV, 2015 WL 6163204, at *3 (Tex. App.—San Antonio Oct. 21, 2015, no pet.).

The testimony supports that this case began when J.G.H. III tested positive for marijuana at his birth. When the investigator arrived at the home, the children were covered with bed bug bites, were suffering from lice, and the younger children were all wearing dirty diapers. J.G.H. III, only a month old at the time, was found in a baby swing, unbuckled, with a bottle positioned for him to drink from. Several witnesses testified regarding Mom's extensive history with the Department and her inability to stop using illegal drugs, especially while pregnant. Prior to the start of this case, Mom no longer had custody of four children—the two oldest children were in the custody of their biological father, and Mom agreed to the adoption by different individuals, one relative and one non-relative, regarding two other children. During this case, Mom gave birth to her eleventh child. In January of 2017, the Department also removed the newborn due to neglect.

As Mom contends, she completed several of the classes required under the service plan. We note that attendance, without implementation, provides no benefit. When the Department attempted reunification, Mom again exhibited an inability to care for S.J.R.-Z. or L.L.L. When asked by the Department investigator why S.J.R.-Z.'s prescription medication bottle was empty,

Mom explained the pills must have fallen out at some point during their move. S.J.R.-Z. also missed over fifteen days of school during the same short three-month period. Even in light of the referrals and assistance provided by the Department, Mom failed to arrange therapy for either S.J.R.-Z. or L.L.L. Additionally, regardless of the Department's requirements, Mom refused to prevent the children's access to the maternal grandmother's residence. *See S.M.L.D.*, 150 S.W.3d at 757–58. Finally, when the investigator arrived to pick up S.J.R.-Z. and L.L.L., the children were dirty and unfed. *See id.*

Despite the Department's intervention and services, the domestic abuse and tumultuous relationship continued between Mom and Dad. Their on-again, off-again relationship was clearly "dysfunctional." During the case, there were accusations of physical abuse and Dad attempting to run Mom over with his vehicle. Although several witnesses testified that domestic abuse was no longer the greatest concern, the trial court could have relied on the parents' previous behavior and determined Mom was incapable of providing a safe environment for the children.

Although the children are not all together in one foster home, the Department was working diligently toward permanent placements for each of the children. Mom's prior and continuing choices portend future instability, thereby endangering the children. *See B.R.*, 456 S.W.3d at 616. The trial court was entitled to infer from her not so distant past conduct, that similar conduct would recur. *See id.* For example, Mom continued to allow the maternal grandmother to have contact with the children, in direct violation of the Department's instructions.

The trial court could have formed a firm belief or conviction that the children's living conditions and surroundings endangered the children's physical and emotional well-being, and that Mom was unable or unwilling to protect them or attend to their needs. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72; *J.G.M.*, 2015 WL 6163204, at *3

### 3. Parenting Abilities and Services Available

Mom visited the children inconsistently; and she was overwhelmed with the children when she did visit. Several witnesses described Mom as "parent[ing] from the chair." The visits were "chaotic" and she would "yell at the kids" instead of "actually speak[ing] to them" and Mom relied on the other older children to care for the younger children. Mom's inability to maintain financial stability was also a concern. Shortly before S.J.R.-Z. and L.L.L. were returned to Mom's care, the housing authority terminated Mom's housing assistance based on fraud. Although the apartment complex tried to accommodate her, Mom was evicted after being unable to meet the monthly rental requirements. The trial court could have reasonably determined the continuous history of instability and ongoing abusive relationship outweighed any of Mom's positive intentions.

Although Mom attended many of the classes, she was unable to implement the lessons learned. Mom's individual counselor opined that Mom was unable to meet the children's needs. Each parent made intermittent improvements, but ultimately resorted to the destructive behaviors exhibited prior to the Department's intervention. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (concluding short duration improvements do not necessarily negate long history of irresponsible choices). A parent is not simply expected to complete the service plan, but to attain service plan goals by "demonstrat[ing] an understanding of services." *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11); *Holley*, 544 S.W.2d

at 371–72. The parent must show an ability to protect the children, develop healthy relationships, and make good decisions. The evidence indicates Mom was unable to learn from the classes in which she participated. *See* Tex. Fam. Code Ann. § 263.307(b)(10), (11); *Holley*, 544 S.W.2d at 371–72.

The goal relating to parental ability was particularly important in this case. Mom's past history with the Department, regardless of the Department's assistance, allowed the trial court to determine that Mom was unable to care for any of her eleven children. Mom exhibited a history that included drug use and domestic violence. Several Department workers testified that Mom repeatedly provided excuses for her behaviors. Finally, Mom minimized the Department's concerns, was not always cooperative with the Department, and expressed resentment at the Department's involvement. *See* Tex. Fam. Code Ann. § 263.307(b)(10), (11); *Holley*, 544 S.W.2d at 371–72.

Accordingly, based on the evidence presented, the trial court could have formed a firm belief or conviction that, even in light of Mom's participation in several of the court-ordered services, Mom failed to work with the Department and did not fully comply with the terms of her service plan. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 261.

*4. Stability of the Home or Proposed Placement*

■ "The goal of establishing a stable, permanent home for a child is a compelling interest of the government." *See Dupree*, 907 S.W.2d at 87. After completing many of the court-ordered services, the Department attempted reunification between Mom and two of the children. The trial court could have reasonably concluded that even with only two children in her care, and the Department caseworker calling regularly, making weekly house calls, and attempting to provide assistance where possible, Mom was unable to provide a safe and stable environment for the two children. *See id.*

*5. Any Excuse for the Acts or Omissions of the Parent*

As the record reflects, Mom attended several of the classes required by the service plan. Yet, she was not able to implement the lessons learned. Several witnesses testified regarding the excuses offered by Mom. One of the frustrated caseworkers relayed that Mom had an excuse for everything. The trial court could have reasonably formed a firm belief or conviction that Mom was not excused for her acts or omissions exhibited during the case.

## C. Trial Court's Determination That Termination of Mom's Parental Rights Was in the Children's Best Interests

The trial court found that Mom "failed to comply with the provisions of a court order[ed service plan]...." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). The trial court's determination regarding Mom's terminations under section 161.001(b)(1) is properly considered in its findings that termination of Mom's rights is in the best interests of the children and is, in fact, probative in determining the children's best interests. *See C.H.*, 89 S.W.3d at 28 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest); *O.N.H.*, 401 S.W.3d at 684.

We remain mindful that the trial court is the sole judge of the weight and credibility of the witnesses. Here, the trial court heard from numerous witnesses and also reviewed several reports filed with the court during the pendency of the case. In

making its determination, the trial court is called upon to determine the children's best interests; above all, the court must consider the children's placement in a safe environment. *See* Tex. Fam. Code Ann. § 263.307(a); *B.R.*, 456 S.W.3d at 615.

Reviewing the evidence under the two sufficiency standards, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, we conclude the trial court could have formed a firm belief or conviction that terminating Appellant Mom's parental rights to her children, S.J.R.-Z., J.C.Z., A.R.Z., L.L.L., K.K.H., and J.G.H. III. was in the children's best interests. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually sufficient to support the trial court's order terminating Mom's parental rights. *See J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108.

### Conclusion

The trial court found Mom committed one statutory ground supporting termination of her parental rights, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(*O* ), and that termination of her parental rights was in the children's best interests, *see id.* § 161.001(b)(2). Based on a review of the entire record, we conclude the evidence is legally and factually sufficient to support the trial court's finding, by clear and convincing evidence, that termination of Appellant Mom's parental rights to her children, S.J.R.-Z., J.C.Z., A.R.Z., L.L.L., K.K.H., and J.G.H. III is in each of the children's best interest. *See id.* § 161.001(b)(2).

We further conclude because Dad failed to challenge, on appeal, an independent ground in support of the trial court's ruling, specifically, he failed to file an admission of paternity, this court must accept this unchallenged finding as true. *See id.*; *N.L.D.*, 412 S.W.3d at 818; *Elamex*, 367 S.W.3d at 888.

Accordingly, we overrule both Mom's and Dad's appellate issues regarding the trial court's termination of their parental rights and affirm the trial court's judgment.