

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00583-CV

**IN THE INTEREST OF I.J.S.**, et al., Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-01574
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Patricia O. Alvarez, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: December 18, 2019

AFFIRMED

Appellant S.S. appeals the trial court's order terminating her parental rights. She argues the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interests of the children. We affirm the trial court's order.

### BACKGROUND

S.S. and her former partner, A.S., are the mother and alleged father of three children: I.J.S, A.A.S., and B.J.S. In July of 2018, the Department of Family and Protective Services ("the Department") removed I.J.S. and B.J.S. because S.S. and A.S. had been physically violent with each other in front of the children. The Department obtained temporary managing conservatorship over all three children and placed I.J.S. and B.J.S. in a foster home. Because of an earlier, closed

case involving the family, A.A.S. had been living with A.S.'s sister since she was born, and the Department kept A.A.S. in that placement in this case.

In its petition seeking to terminate S.S.'s and A.S.'s parental rights, the Department alleged, inter alia, that termination was warranted under section 161.003 of the Texas Family Code ("the Code") because she "has a mental or emotional illness or a mental deficiency that renders [her] unable to provide for the physical, emotional, and mental needs of the children and will continue to render [her] unable to provide for the children's needs until the 18th birthday of the children." *See* TEX. FAM. CODE ANN. §161.003(a). Because the Department sought termination under section 161.003, the trial court appointed both an attorney ad litem and a guardian ad litem to represent S.S.'s interests. *Id.* § 161.003(b). The Department prepared a service plan for S.S., explained it to her, and went over the required services with her "[m]ultiple times." The "top three services" the Department required S.S. to complete were "[h]er mental health, domestic violence, and to receive therapy."

The evidence presented at trial showed that S.S. had been diagnosed with adjustment disorder with anxiety, could not read or write more than her own name, and had an "extremely low" IQ. The evidence also showed that S.S. had difficulty understanding "that there are people in this world she really shouldn't be around." She had a history of romantic involvement with violent men, including A.S., and was "easily led, easily taken advantage of." At the time of trial, she was living with a man who had been convicted of aggravated assault and who had convinced her to designate his mother as the payee on her Social Security disability payments.

A Department caseworker testified that during S.S.'s visits with the children, S.S. "ha[d] issues with knowing how to feed her children, how to interact with them separately. . . . She has to be told to change their diapers and things of that nature." The caseworker agreed that S.S. loves her children, but nevertheless testified that S.S. "is unable to care for her children on her own."

She explained that S.S. repeatedly suggested unsafe or unstable individuals as potential caretakers for the children and that S.S. did not understand why those individuals would not be appropriate placements. She also noted that I.J.S. "has bad dreams before he is to attend visits" with S.S. and does not have bad dreams when there are no visits.

S.S.'s therapist, Victoria Caylor, testified that "[i]t's really difficult for [S.S.] to understand this world that we live in" and that S.S. has trouble retaining information and will always need help with life skills like paying bills and being on time for appointments. Caylor explained that S.S. "doesn't understand the severity of what was going on in her life"—for example, S.S. told Caylor that "[i]t was fine" that the children had previously been living in a home with a roach infestation because "the cock roaches don't bite." She also testified that S.S. puts her own needs before those of the children. She noted, for example, that one of S.S.'s aunts offered to let her and the children move into the aunt's home, but S.S. refused because she did not want to follow her aunt's rules. Caylor explained that S.S.'s level of mental functioning made it difficult for her to address the reasons why the children were removed from her care and that S.S. "didn't quite understand why you can't do" things like "[l]eaving the children alone, the cock roach issue, being around inappropriate people." She concluded that S.S. did not have the ability to understand how to raise children, that it would not be safe to return the children to her, and that S.S.'s ability to provide for the children's physical, emotional, and mental needs would not improve before the children turn 18.

S.S. testified that she tried to comply with the Department's requirement that she attend parenting and domestic violence classes, but she "couldn't understand" the classes because she is "a slow learner." She understood, however, that the purpose of the classes was "[t]o show [her] how to be a mom." She testified that she understood she could not care for the children by herself,

but she also testified that she believed if she completed her service plan, she "was going to get [her] kids like on [her] own."

The trial court found by clear and convincing evidence that termination of S.S.'s parental rights was justified under section 161.003 of the Code. It also found that termination of both S.S.'s and A.S.'s rights was warranted under sections 161.001(b)(1)(N) and (O) of the Code. Finally, it found by clear and convincing evidence that termination of S.S.'s and A.S.'s parental rights was in the children's best interests. S.S. appealed the trial court's ruling, but A.S. did not.

## ANALYSIS

S.S. has not challenged the predicate grounds upon which the Department relied to terminate her parental rights. Instead, she has only argued that the Department did not present legally or factually sufficient evidence that termination was in the children's best interests.

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to show, by clear and convincing evidence, both that a statutory ground existed to terminate S.S.'s parental rights and that termination was in the children's best interests. TEX. FAM. CODE ANN. § 161.206; *In re A.H.*, 414 S.W.3d 802, 806 (Tex. App.—San Antonio 2013, no pet.). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the legal and factual sufficiency of evidence supporting a trial court's order of termination, we apply well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Evidence is legally sufficient to support a trial court's termination order if a "reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true." *In re J.F.C.*, 96 S.W.3d at 266. In conducting a legal sufficiency review, we review the evidence in the light most favorable to the finding and "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re R.S.-T.*, 522 S.W.3d 92, 98 (Tex. App.—San Antonio 2017, no pet.). "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.*, 96 S.W.3d at 266. Nevertheless, "we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence." *In re S.L.M.*, 513 S.W.3d 746, 748 (Tex. App.—San Antonio 2017, no pet.).

In a factual sufficiency review, we must review and weigh all of the evidence, including the evidence that is contrary to the trial court's findings. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We consider whether the disputed evidence is such that a reasonable factfinder could have resolved it in favor of the challenged finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.* In both a legal sufficiency review and a factual sufficiency review, the trial court, as factfinder, is the sole judge of the weight and credibility of the evidence. *In re E.X.G.*, No. 04-18-00659-CV, 2018 WL 6516057, at *1 (Tex. App.—San Antonio Dec. 12, 2018, pet. denied) (mem. op.).

***Applicable Law***

In deciding whether to terminate a parent-child relationship, there is a strong presumption that the child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). In determining whether the Department satisfied this burden, courts should consider factors regarding whether a parent is willing and able to provide a child with a safe environment. TEX. FAM. CODE ANN. § 263.307. This is because promptly placing a child in a safe environment is presumed to be in a child's best interest. *Id.* These factors include, inter alia: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; whether the child is fearful of living in or returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills. *Id.*

Courts may also apply the non-exhaustive list of factors the Supreme Court promulgated in *Holley v. Adams*. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest

of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

However, a best interest finding does not require proof of any particular factors. *See In re G.C.D.*, 2015 WL 1938435, at *5. Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.).

### *Application*

### *Legal Sufficiency*

It is undisputed that S.S.'s middle child, A.A.S., has been in an out-of-home placement since birth in connection with a previous Department investigation. TEX. FAM. CODE § 263.307(b)(2). It is also undisputed that S.S. did not complete the mental health, domestic violence, and therapy requirements of her service plan in this case. *Id.* § 263.307(b)(10), (11). Additionally, the Department presented evidence that S.S. previously lived with I.J.S. and B.J.S. in a home that was infested with roaches and that she did not understand that situation was unsafe for the children. *Id.* § 263.307(b)(12). The Department's caseworker testified that I.J.S. has bad dreams before he is scheduled to visit with S.S. but does not have bad dreams when there are no visits. *Id.* § 263.307(b)(5). The caseworker also testified that S.S. "has to be redirected" during her visits with the children and that she brought the children food that was not appropriate for their ages. *Id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 372. Finally, the Department presented evidence

that all three children were living in safe, stable homes with caregivers who were meeting their needs and wanted to adopt them. *Holley*, 544 S.W.2d at 372.

Caylor testified that S.S. is unlikely to be successful in therapy. TEX. FAM. CODE § 263.307(b)(10). Caylor also testified that S.S. has shown she is unwilling or unable to make positive environmental and personal changes—for example, by refusing to follow her aunt's rules in exchange for a home for her and the children and by continuing to become involved with violent men. *Id.* § 263.307(b)(11), (12). Based on what she observed in her sessions with S.S., Caylor concluded S.S. does not have the ability to meet the children's physical, emotional, and mental needs and will not gain that ability before the children—who were four, two, and one at the time of trial—reach adulthood. *Id.* § 263.307(b)(1), (11), (12); *see also Holley*, 544 S.W.2d at 372. Finally, S.S. confirmed that A.S. has a history of assaultive conduct; that even though they are no longer together, A.S.'s mother "keeps dropping him off at [S.S.'s] house"; and that S.S. had been in contact with him as recently as the day before the trial. TEX. FAM. CODE § 263.307(b)(7); *see also Holley*, 544 S.W.2d at 372.

Based on this evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of S.S.'s parental rights was in the children's best interests. *See In re S.L.M.*, 513 S.W.3d at 750. Accordingly, we hold that this evidence is legally sufficient to support the trial court's order terminating S.S.'s parental rights. *See id.*

### Factual Sufficiency

At trial, S.S.'s attorney suggested that termination was not necessary because the trial court could both maintain S.S.'s parental rights and protect the children by making S.S. a possessory conservator with "only supervised visits" and "no decision making." In support of this outcome, S.S. presented testimony from her cousin, Diane Cantu, who testified that she "[k]inda" understood

S.S.'s limitations, that she would be willing to take custody of I.J.S. and B.J.S.,[1] and that if the trial court decided not to terminate S.S.'s rights, she would obey any restrictions the court put on S.S.'s access to the children. Cantu also testified that she had no criminal history, but on cross-examination, she admitted she had previously been convicted of driving while intoxicated. Cantu also testified that she lived in a two-bedroom home with her husband and two children and that she and her husband did not earn enough money to meet their own family's needs. *See Holley*, 544 S.W.2d at 372. She stated, however, that if she took custody of I.J.S. and B.J.S., she "would do everything [she] can to upgrade [her] house."

S.S. testified that she loved her children. She understood she could not care for them by herself, but stated that she not want her rights to be terminated and she wanted Cantu to care for them. She admitted that she did not complete the requirements of her service plan, but testified, "Now that I got a ride, I could go to my parenting and domestic violence [classes]." She also testified that she is "learning how to feed [and] change" B.J.S.

Even after considering Cantu's and S.S.'s testimony, we conclude that a reasonable factfinder could have resolved the disputed evidence in favor of a finding that terminating S.S.'s parental rights was in the best interests of the children. *See In re J.O.A.*, 283 S.W.3d at 345; *In re S.L.M.*, 513 S.W.3d at 750. We therefore hold that the evidence is factually sufficient to support the trial court's order terminating S.S.'s parental rights. *See In re S.L.M.*, 513 S.W.3d at 750.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice

---

[1] Cantu was not asked whether she would be willing to take custody of A.A.S.