

## Fourth Court of Appeals

### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-21-00223-CV

**IN THE INTEREST OF A.G.**, a Child

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-02472
Honorable John D. Gabriel, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Irene Rios, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: November 17, 2021

AFFIRMED

Mother (S.A.) and Father (S.G.)[1] appeal the trial court's order terminating their parental

rights to A.G.  On appeal, Mother and Father argue that: (1) the evidence is legally and factually

insufficient to support the trial court's finding that termination of their parental rights was in the

best interest of the child; and (2) because the evidence is insufficient and the order must be

reversed, the trial court abused its discretion by awarding the Texas Department of Family and

Protective Services (the "Department") permanent managing conservatorship.  We affirm.

### BACKGROUND

On December 9, 2019, the Department filed a petition for protection of nine-month-old

A.G., for conservatorship, and to terminate the parental rights of Mother and Father.  A.G. was

---

[1] S.G. is the presumed father of A.G.

removed from his parents' care and later placed with his paternal grandparents. The case proceeded to a bench trial via Zoom on March 18, 2021 and May 6, 2021. The Department presented the testimony of the investigator who filed the affidavit for removal, the parents' caseworker, a Department supervisor, and the paternal grandmother caring for A.G. Mother and Father also testified.

### Department Investigator

The Department's investigator, Amber Gomez, testified she initially became involved in the case due to a referral alleging both parents were using drugs in the home around A.G. and both parents had dropped A.G. "a couple of times." Gomez repeatedly attempted to locate and make contact with Mother and Father but was unsuccessful. Gomez interviewed A.G.'s eight-year-old cousin A.A. who, along with his mother Melody, lived in the same home as A.G.; he outcried that A.G.'s parents used drugs in the home around A.G. Gomez also interviewed Melody, who admitted that she and both of A.G.'s parents were using drugs in the home. Melody alerted A.G.'s parents about the Department's investigation and Mother and Father fled with A.G. After locating A.G. through the Department's missing children procedure, A.G. was removed and placed in the Department's care.

### Department Caseworker

Erica Nombrana, the Department caseworker assigned to A.G.'s case, testified the parents could not be located for personal service in the case until July 2020.[2] Nombrana prepared and filed a family service plan for Mother and Father. Both parents were required to complete an OSAR assessment for substance abuse, parenting classes, individual counseling, a psychological evaluation, and drug treatment. The most important service was drug treatment. Both parents

---

[2] The record contains an order for substituted service by posting signed by the court on January 15, 2020.

refused to sign their family service plans and failed to engage in the services on their plans without giving any reason. Neither parent visited A.G. during the period between his removal on December 9, 2019 and the date of trial on March 18, 2021, and neither inquired about A.G.'s welfare during that period other than to ask where he was placed. Nombrana explained that she was never able to identify the parents in person because they never showed up to any appointments. Nombrana testified she made three different appointments to meet with Mother and Father in person, but although they were aware of the appointments, they were "no-shows" to all three and gave no reason or excuse at the time. Nombrana testified that the court ordered they have no contact with A.G. at the beginning of the case.[3] She was not aware that the parents were granted twice-monthly supervised visitation at the initial hearing. But, she stated that when Covid arose, she requested to meet with the parents at the Department to possibly set up virtual visits with A.G. but the parents did not show up. Nombrana conceded the parents did request visits by email but she needed to meet with them in person to verify their identity before setting up any visits, either virtual or in person, and they failed to meet.

Nombrana emailed their family service plans to their attorneys and copied the parents on the emails. As of the March 18, 2021 trial date, neither parent was engaged in nor had they completed any of the services required by the Department in their plans. Nombrana stated she had arranged for the parents to engage in their services and gave them the names and numbers of the providers. Before trial, Nombrana called the providers and verified the parents did not engage in any of the services. Father and Mother did submit a certificate of completion for a parenting class they chose and paid for outside of their service plans. Mother and Father never drug tested for the

---

[3] The record contains a No Contact Visitation Order dated September 20, 2020.

Department despite requests, and Nombrana had ongoing concerns that drug use was still an issue for both.

With respect to A.G.'s placement, Nombrana stated he was placed with his paternal grandparents who also have custody of A.G.'s three and a half year old sibling G.G. A.G. has been placed there since February 2020. A.G. is doing very well and is very bonded to and comfortable with his grandmother Carolina and his sibling G.G. A.G.'s grandmother is very protective and loving toward A.G. Nombrana testified there was no connection or bond between A.G. and Mother or Father. The grandparents' home is safe, loving, and more suitable for A.G. and he is already bonded to them and his sibling who also resides there. Mother and Father have not shown they can provide A.G. with a safe, stable, and drug-free environment. A.G.'s sibling was placed with the grandparents for the same reason that A.G. was removed and the parents' rights were terminated to that child.

Nombrana stated the parents only provided a P.O. Box for an address and never provided a residential address that could be verified. According to Nombrana, they moved from hotel to hotel. To her knowledge, neither parent was working during the pendency of the case. The parents provided five different emails and Nombrana used all five emails whenever she communicated. The parents sometimes replied to her emails but were "argumentative" and did not discuss the information Nombrana provided. The parents had the same phone number during the entire case, but did not answer the phone or return calls after she left messages. Nombrana stated she really had no effective communication with them.

Nombrana testified that neither parent had made the necessary efforts or changes required to regain custody of A.G. and she had informed them multiple times that failure to complete their service plans could result in termination of their parental rights to A.G. In addition, Nombrana

testified a search of the paternity registry revealed that Father failed to take the steps necessary to establish his paternity of A.G.

### Mother

Mother testified that A.G. was removed from her on December 22, 2019. She and Father did not attend the initial hearing in December 2019 because they were "not informed." They requested information but got no responses. Their first contact with Nombrana was February 28, 2020 when she told them they were unable to see A.G. until the June 3rd court date. They did not receive any documentation about the case until they attended their first hearing on July 17, 2020. Mother stated they knew they had appointed attorneys but first learned their attorneys' names at the July hearing. They are currently on their third set of attorneys. During the period between December 2019 and July 17, 2020, they were "trying to gain a lot more stability" and nicer housing, but work was slow. They did a lot of research, engaged in classes on their own, contacted treatment centers, and requested visits with A.G. Mother testified she sent at least fifteen emails to Nombrana requesting visitation, their family service plans, referrals, and information on how A.G. was doing. They received responses, "but no information that they needed." Mother stated they attempted to find out the identity of Nombrana's supervisor and also called the court, but just got "bounced around."

Mother explained they did not go meet with Nombrana because they did not believe she would set up visits until they signed their service plans, and they told Nombrana early on they would not sign the service plans because their child was removed from them for no reason and with no substantiation, notice, or prior contact. Mother conceded they received two attempt-to-contact notices over less than two weeks, but stated that was not sufficient notice. Mother further explained that she and Father do not have physical I.D.'s to prove their identity. Mother agreed this is not her first CPS case and she knows what is required of a parent to keep their rights, but

explained she did not know "exactly each thing" that was required to comply with her service plan in this case. In the prior CPS case, she and Father did everything they were supposed to do and still lost their parental rights. During the pendency of this case, they paid for and completed their own classes for parenting, conflict resolution, life skills and a four-hour drug education and awareness class; they emailed the certificates to Nombrana. Mother and Father only received one request to drug test but, according to Mother, were given only four hours' notice and they could not make the appointment because Father was at work 45 minutes away, they did not have a vehicle, and she is not good at public transportation. The last time she and Father used drugs was prior to A.G.'s birth due to the CPS case with their other child. They would test negative today if the court ordered a urine or hair follicle test.

At the end of the day, the trial court granted a six-week continuance to allow the parents to drug test, engage in the services on their family service plans, and have visits with A.G. The court ordered the parents to take a hair follicle test during the continuance period.

### *Department Supervisor*

At the continuation of trial on May 6, 2021, the first witness was Armadina Ruiz, a supervisor in the Department. Ruiz testified she went over the family service plans with the parents in person on April 16, 2021 and instructed them where to go for the court-ordered hair follicle test. The parents indicated they understood but refused to sign their plans because they did not agree with the stated reason for removal of the child or with the requirement to take a hair follicle test. The parents told Ruiz they wanted to consult with their attorneys before submitting to a hair follicle test so Ruiz extended the test deadline to April 20, 2021. Ruiz testified the parents never completed the hair follicle test. In Ruiz's opinion, the parents did not want to take accountability. Ruiz confirmed that the referrals for the other services were in place and the parents told her they would engage in those services. A psychological evaluation was scheduled, but the parents missed the

appointment with no reason given; the provider told Ruiz the parents were not returning phone calls. The parents scheduled a counseling appointment for mid-May, after the trial date. The parents sent an email to Ruiz at midnight the night before trial with a copy of their drug and alcohol assessment but she had not had a chance to review it yet. The parents sent in certificates for a parenting class they completed although it was not the class on their family service plans. Ruiz requested but did not receive any proof of where they live. The parents told her they receive unemployment but she did not get any verification.

Visits with A.G. were scheduled for the parents on Saturdays for one hour through a third party contractor. The parents were generally compliant, but there were "a few" missed visits. Ruiz observed a visit on April 16, 2021 that was appropriate in which the parents brought toys and attempted to engage A.G. as much as they could, but A.G. was not very interested. In Ruiz's opinion, there is no bond between A.G. and the parents.

Since the parents have not complied with their service plans or drug tested, the Department was still seeking termination of their parental rights. Ruiz testified that termination was in A.G.'s best interests because the parents have not addressed the Department's substance abuse concerns, refused to drug test, failed to complete the services on their family plans, and there is no bond between the parents and the child. The paternal grandparents wish to adopt A.G. and it is in his best interest to remain in their home.

### *Father*

Father testified he has not used drugs in two years. The reason he did not take a drug test during the case is because the Department did not do a drug test before they took his child away "so why should he have to do it to get him back?" In addition, Father has no physical I.D. and one is required to do a drug test. He denied that the Department told him they could do the hair follicle test without any I.D. Father explained he lost his I.D. two or three years ago; two months ago, he

scheduled an appointment in June to get a new I.D. He conceded that he knew the Department was going to want drug tests during this case. Father testified he and Mother never talked to their attorneys about doing the hair follicle test. Father stated he would take a court-ordered hair follicle test now. When asked why the court should believe him, Father answered, "I don't know … [I am] aware more now that it would help more than being stubborn."

Father stated he and Mother did not appear for their psychological evaluations because they had car trouble; he tried to reschedule but got no response. He completed a four-week online drug education program in March 2021 on his own; the Department should have the certificate. Father testified that he and Mother only got a family plan "evaluation" and they still do not have a family service plan.

Father explained he and Mother missed the first visit with A.G. because the Department did not give his mother the address of the location. On cross-examination, he explained that the April 3rd visit was rescheduled from 11:00 a.m. to 2:00 p.m. and his mother showed up with A.G. but they did not because their Lyft ride was late and his mother "didn't want to wait." Father stated they missed a second visit on April 10 because "they didn't contact them to tell them they had an appointment." He stated he now understands there is a set schedule on Saturdays and knows the location and the visits with A.G. are going well.

Father expressed his desire that A.G. be placed back with him. Father testified he and Mother now live in an apartment and stated the address. They have a spare bedroom set up for A.G. and it would be alright for the Department to come see their home at that address. During the pendency of the case, they lived at three different places, including some time in motels, before getting their current apartment. The Department never asked to come see where they lived during the case. Father receives unemployment and works for a subcontractor and gets paid in cash.

Father knew A.G. was placed with his mother in February 2020 and he would call to see how A.G. was doing. He agreed the Department's reason for removing A.G. was based on "drug use and dropping … physical abuse." Father admitted he had a prior CPS case in which his rights were terminated in November 2018. His relationship with his mother changed during that first CPS case due to the allegations of drug use and lies told by the Department and by his mother. He does not have a good relationship with his mother now. Father agreed, however, that her home is a safe, stable, and drug-free environment.

### *Mother*

Mother testified again and agreed that Nombrana emailed them on March 19, 2021 with the location and time-frame for the hair follicle test. But, they were unable to get the hair follicle test done because the place wanted a physical I.D. They went to another lab but it also required a physical I.D. Mother has a driver's license but lost the physical copy in early 2020 and needed some documentation to get a new one. She currently has an appointment to get a new I.D. in July; a prior appointment had to be rescheduled. Mother and Father instead offered to do a swab test but the Department refused. Mother conceded that she knows hair follicle tests go back farther in the past and she knows the court specifically ordered that test.

Since the last trial date, Mother "attended every visitation that I was offered that people knew where to go," did a substance abuse assessment, and set up an appointment for the psychological evaluation but had to reschedule due to issues that were not her fault. The report from the substance abuse assessment was pending. Mother knows that Father's mother has A.G. and his sibling, but Mother is not in contact with her. Mother is currently working for delivery services Door Dash and Favor and receives unemployment.

### *Paternal Grandmother*

Carolina, the paternal grandmother, testified that A.G. and his sibling G.G. are doing great in her care. She would be willing for Father to have custody of A.G. if she knew he and Mother were "out of drugs" and would stay off drugs. Carolina knew they were doing drugs before Mother got pregnant, and they have been struggling with drug use for a while. Carolina has concerns for A.G.'s safety because Mother has already lost custody of two previous children and Father has four other children that he is "not engaged with at all." Carolina had not seen Father since he lost his parental rights to G.G. She only sees him now at the visits with A.G. Carolina does not talk to Mother at all because Mother accuses her of stealing G.G. Carolina adopted G.G. after their parental rights were terminated. G.G. is very attached to A.G., as he is to her. Carolina confirmed the parents missed the first scheduled visit with A.G. due to trouble with their Lyft ride and did not show up for the second visit. Father told her they were not informed of the second visit.

### *Trial Court Ruling*

At the conclusion of all the testimony, the trial court stated on the record that one of the specific reasons it granted a six-week continuance was to obtain a drug test result to see whether the reason for removal was still a concern and expressed disappointment the test was not done. The trial court found two predicate grounds for terminating Mother's and Father's parental rights, specifically, their failure to comply with the provisions of their court-ordered family service plans, and continued drug use. TEX. FAM. CODE ANN. § 161.001(b)(1)(O), (P). The trial court also found that Father failed to legitimate paternity of A.G. *Id.* § 161.002(b). The trial court further found that termination of Mother's and Father's parental rights was in A.G.'s best interest and awarded the Department permanent managing conservatorship of A.G. *Id.* § 161.001(b)(2). Both Mother and Father appeal the trial court's best interest finding and the conservatorship award.

**STANDARD OF REVIEW**

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

**CHILD'S BEST INTEREST**

Mother and Father argue the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the best interest of A.G. Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE ANN.

- 11 -

§ 263.307(b).[4] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent–child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Mother and Father do not challenge the predicate grounds for termination, and those findings may be also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28.

A.G. was approximately nine months old when he was removed and was two years old at the time of trial. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have

---

[4] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[5] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371–72).

spent minimal time with a parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). The evidence showed that A.G was strongly bonded with his paternal grandmother with whom he had been placed for over a year. A.G. was also bonded with his older sibling G.G. who the grandparents had previously adopted after Mother and Father's parental rights to her were terminated. The paternal grandparents passed a home study and Father admitted that their home provided a safe, stable, and drug-free environment for A.G. The Department's plan was for the paternal grandparents to adopt A.G. if the parents' rights were terminated. Although there was no evidence that A.G. has any specialized needs, there was testimony that A.G.'s grandmother Carolina had demonstrated an ability to meet his basic needs and he was thriving under her care. Conversely, the testimony showed the parents had no visits with A.G. between December 2019 and April 2021, and had no bond or relationship with A.G. Even after weekly visits were set up in April 2021, the parents missed two of the four April visits.

When trial resumed on May 6, 2021, the parents still had not taken any drug test, including the hair follicle test specifically ordered by the trial court. The reason for A.G.'s removal was the Department's concern about the parents' drug use and the danger it posed to A.G.'s safety in the home. Due to the parents' failure to comply with their family service plans, the trial court did not have a completed drug assessment report to review, or any evidence to show the parents had completed a drug treatment program. Nombrana testified the parents never addressed the Department's concerns about drug use in the home. During their testimony, both parents denied any drug use during the last two years. Father conceded at trial that the court had no way to verify his home was drug-free, but argued there was also no proof he and Mother have used drugs during the case. However, Gomez and Carolina provided evidence of the parents' drug use before the case began and a court may judge a parent's future conduct by his or her past conduct in determining whether termination is in the child's best interest. *In re E.D.*, 419 S.W.3d at 620.

Further, according to Department policy, the parents' failure to take the hair follicle test ordered by the court and to take the drug test previously requested by the Department are considered positive results. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at \*5 (Tex. App.—San Antonio June 24, 2020, pet. denied) (mem. op.); *see also In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (a fact finder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs). Finally, the trial court found by clear and convincing evidence that both Mother and Father have continued to use drugs and the parents do not challenge that predicate finding. *See In re C.H.*, 89 S.W.3d at 28.

In addition, the parents made no effort to cooperate with the Department. According to Gomez, the parents fled with A.G. when they learned about the Department's investigation. After A.G. was removed in December 2019, the parents could not be located for service of process until July 2020. Mother and Father repeatedly refused to sign their family service plans and sought out their own services instead of completing the services designated by the Department. The parents made several appointments to meet with Nombrana but never kept them even though they knew an in-person meeting was a precondition for visits with A.G. Both parents had prior CPS history and both their parental rights had been terminated to A.G.'s sibling in November 2018, only one year before A.G. was removed for the same reason – substance abuse in the home. Despite knowing the consequences of a failure to cooperate with the Department, the parents failed to sign and comply with their family service plans, drug test, or meet with their caseworker. The dismissal deadline for the case was extended to eighteen months and a six-week trial continuance was granted to provide the parents with additional opportunities to comply; however, they failed to take advantage of the extended opportunities to engage in their services. Father also has four other children with whom he has no relationship. Finally, the evidence showed the parents did not have

a stable home, staying at three different addresses during the pendency of the case, including a six-month stay at a motel.

Having reviewed the record and considered all the evidence in the appropriate light of each standard of review, we conclude the trial court could have reasonably formed a firm belief or conviction that termination of Mother's and Father's parental rights was in A.G.'s best interest. *See In re J.O.A.*, 283 S.W.3d at 344-45.

## CONSERVATORSHIP

Finally, Mother and Father assert that if the termination order is reversed, the issue of conservatorship of A.G. should be reconsidered. Because we affirm the trial court's termination order as to both parents, we need not address the conservatorship issue. *See In re C.J.Y.*, 2020 WL 3441248, at *5.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's order terminating Mother and Father's parental rights to A.G.

Liza A. Rodriguez, Justice