

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-22-00184-CV

**IN THE INTEREST OF J.A.R.R.**, J.N.R., and M.A.R., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2020PA01005
Honorable Kimberly Burley, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Beth Watkins, Justice

Delivered and Filed: September 21, 2022

AFFIRMED

Appellants M.R. (Father) and C.R. (Mother) appeal the trial court's order terminating their parental rights to their children J.A.R.R. (born 2010), J.N.R. (born 2015), and M.A.R. (born 2020).[1] Father argues the evidence is legally and factually insufficient to support one of the trial court's predicate findings under Texas Family Code section 161.001(b)(1) and its finding that termination of his parental rights is in the best interest of the children. Mother argues the evidence is legally and factually insufficient to support the finding that termination of her parental rights is in the children's best interest. We affirm the trial court's order.

---

[1] To protect the privacy of the minor children, we use initials to refer to the children and initials or pseudonyms to refer to their biological parents and caregivers. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

In May of 2020, the Texas Department of Family and Protective Services removed the children from Father's and Mother's home because it had received reports of medical neglect. When the children were removed, both J.N.R. and M.A.R. were underweight to the point that they were immediately hospitalized for malnourishment (J.N.R.) and failure to thrive (M.A.R.). J.A.R.R., in contrast, was severely overweight. The Department obtained temporary managing conservatorship over the children, placed them in foster care, and filed a petition to terminate Father's and Mother's parental rights. At the time of trial, J.A.R.R. and M.A.R. were placed with Mother's brother D.R. (Uncle) and his wife J.G.R. (Aunt). Due to her complex medical needs, J.N.R. was placed in a specially licensed foster home.

The Department created a joint family service plan that required Father and Mother to, inter alia, participate in individual counseling to address the issues that led to the children's removal, attend all the children's medical appointments, familiarize themselves with the children's medical diagnoses, and "work with doctors and specialists to develop a full understanding of necessary treatments, appointments, or medications for [the] children" as a condition of reunification. The Department ultimately pursued termination of Father's and Mother's parental rights.

On September 29, 2021, January 7, 2022, and January 28, 2022, the trial court held a bench trial at which both Father and Mother appeared. The trial court heard testimony from seven witnesses: (1) the Department's caseworker, Alyssa Miller; (2) the parents' therapist, Victoria Caylor; (3) Myrah Guerra, a Department caseworker who briefly took over this case while Miller was on leave; (4) Aunt; (5) the court-appointed special advocate; (6) Mother; and (7) Father. The trial court also admitted the parents' joint service plan into evidence. After hearing the evidence, the trial court signed an order terminating both parents' parental rights pursuant to section

161.001(b)(1)(D) and (O) and its finding that termination was in the children's best interest. Father and Mother appealed.

## ANALYSIS

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate Father's and Mother's parental rights and that termination was in the best interest of the children. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would

prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

### *Father's Appeal*

In his first issue on appeal, Father argues the evidence is legally and factually insufficient to support the trial court's finding that termination was warranted under Texas Family Code section 161.001(b)(1)(D). He does not, however, challenge the trial court's finding that termination was warranted under Texas Family Code section 161.001(b)(1)(O).

### *Statutory Termination Grounds*

### *Applicable Law*

In general, assuming a best interest finding, only one predicate ground under section 161.001(b)(1) is necessary to support a judgment of termination. *In re A.V.*, 113 S.W.3d at 362; *In re A.R.R.*, No. 04-18-00578-CV, 2018 WL 6517148, at *1 (Tex. App.—San Antonio Dec. 12, 2018, pet. denied) (mem. op.). To be successful on appeal, an appellant must challenge all the predicate grounds upon which a trial court based its termination order. *In re S.J.R.-Z.*, 537 S.W.3d at 682. When an appellant does not challenge all the grounds that may support an order of termination, we typically do not address the sufficiency of the evidence of any of the predicate grounds for termination. *See In re A.V.*, 113 S.W.3d at 361–62; *In re S.J.R.-Z.*, 537 S.W.3d at 682. Instead, we must accept the validity of the unchallenged grounds and affirm the termination order. *See In re A.V.*, 113 S.W.3d at 361–62; *In re S.J.R.-Z.*, 537 S.W.3d at 682–83.

However, because termination under subsections 161.001(b)(1)(D) or (E) may have implications for a parent's parental rights to other children, appellate courts must address issues challenging a trial court's findings under those subsections. *In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam). Therefore, we will consider Father's sufficiency argument as to subsection D even though he does not challenge termination under subsection O. *See In re L.C.*,

No. 12-19-00137-CV, 2019 WL 4727826, at *2 (Tex. App.—Tyler Sept. 27, 2019, no pet.) (mem. op.) (addressing parents' sufficiency challenges to subsections D and E even though they did not challenge all grounds upon which termination could be supported).

Subsection D allows a trial court to terminate parental rights if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under subsection D, the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Environment" refers to the acceptability of the child's living conditions and a parent's conduct in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct." *In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. denied).

"A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re S.R.*, 452 S.W.3d at 360. A parent does not need to know for certain that the child is in an endangering environment. *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.). Awareness of a potential for danger is sufficient. *Id.* Moreover, "[s]ubsection D permits termination based upon only a single act or omission." *Id.* The relevant period for review of environment supporting termination under subsection D is before the Department removes the child. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

*Application*

"Neglect of a child's medical needs endangers the child." *In re T.M.T.*, No. 14-18-00442-CV, 2018 WL 6053667, at *11 (Tex. App.—Houston [14th Dist.] Nov. 20, 2018, no pet.) (mem. op.) (considering endangerment under both subsections D and E). Here, the evidence shows that while the Department did not remove the children until May of 2020, it began working with the family on January 28, 2020. However, even with the Department's assistance during the first months of 2020, five-year-old J.N.R. and four-month-old M.A.R. were so underweight at the time of their removal that they were immediately hospitalized for malnourishment and failure to thrive, respectively. At the time of removal, five-year-old J.N.R. weighed approximately twenty-four pounds, which Father agreed at trial was "the weight of an average two-year-old." While Father argues on appeal that "[n]o medical evidence was presented at trial to substantiate" the concerns that led to the children's hospitalization, Father himself testified that he was concerned about J.N.R.'s weight at the time of her removal. *See In re R.S.-T.*, 522 S.W.3d at 109 (awareness of potential for danger is sufficient to support subsection D finding). Additionally, neither Father nor Mother argued or presented evidence at trial suggesting that the children's hospitalization was not necessary.

Miller testified that J.N.R. "is not able to eat solid foods" and must be fed through a G-tube. Father testified that he reached out to J.N.R.'s doctor about her weight before the Department became involved with the family, but he stated that he "can only give her the regimens that the doctor was recommending to give her. I just didn't give her no more regimen that what they were—I was told to give her." He agreed, however, that J.N.R. was underweight because her G-tube was leaking and "she wasn't getting all her nutrients." He also agreed that he and Mother would notice when the G-tube was leaking and that they "would change out the gauze" but that they did not take J.N.R. to the doctor to have her G-tube replaced until after the Department became involved with

the family. He also testified that he is not certified to change the G-tube himself. *See In re T.M.T.*, 2018 WL 6053667, at *11 (considering parent's inability to care for child's feeding tube in endangerment analysis). Miller testified that when J.N.R. came into the Department's care, her G-tube "was ill-fitting, it was leaking, and [Father and Mother] did not notice that." She stated that Father and Mother "have argued with me, stating that the G-tube had no issues, because it didn't need to be replaced; so, therefore, it was fine. However, it did need to be reset and refitted and it could have led to an infection." *See id.*; *see also In re R.S.-T.*, 522 S.W.3d at 109.

Father agreed at trial that J.N.R. receives all of her nutrients through the G-tube. However, Miller testified that during this case, both Father and Mother had "reiterated that, whenever [J.N.R.] was with them, that she would be able to eat food" and had asked "why [J.N.R.]'s not eating solid foods." Miller stated that Father and Mother asked these questions even though they were "reminded several times that [J.N.R.] has failed a swallow study [and] does not have the mechanisms to be able to swallow properly." Miller testified that Father's and Mother's inability or refusal to understand J.N.R.'s feeding limitations "is a safety concern, as [J.N.R.] does not know how to swallow, and she could choke on her food."

It is undisputed that J.N.R. has multiple complex medical needs in addition to her feeding issues. Her diagnoses include septo optic dysplasia sequence, cerebral palsy, growth hormone deficiencies, hypothyroidism, adrenal insufficiency, hypoglycemia, and "possible sickle cell traits." Guerra testified that J.N.R. typically has approximately six medical appointments a week because "[s]he has a ton of medical needs." It is undisputed, however, that J.N.R. missed multiple required medical appointments prior to her removal. Father testified that J.N.R. missed these appointments because the family lacked transportation. Miller testified, however, that "[J.N.R.] was covered by Medicaid transportation, is covered to any and all appointments." *See In re T.M.T.*,

2018 WL 6053667, at *10–11 (considering parent's inability to "keep up with [child's] medical appointments" in endangerment analysis).

Like J.N.R., M.A.R. was underweight at the time of his removal and was hospitalized immediately upon coming into the Department's care. During his hospitalization, he was diagnosed with failure to thrive. At trial, Father agreed that M.A.R. was underweight at the time of his removal. *See In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *4 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) (trial court may consider child's "physical and developmental condition" at time of removal in endangerment analysis).

With regard to J.A.R.R., the child was nine years old and weighed nearly 200 pounds when he was removed from his parents' care. Miller testified that due to his weight, he was being monitored for prediabetes as early as January of 2020 and "was supposed to be seeing a specialist. He was not being taken to those appointments." *See id.*; *see also In re T.M.T.*, 2018 WL 6053667, at *10–11. The trial court heard evidence that J.A.R.R.'s weight problem began as early as four years before his removal. Miller noted that when J.A.R.R. first came into the Department's care, "he would have no idea what vegetables were." Father agreed that he was aware of J.A.R.R.'s weight problem and testified that he tried to ameliorate the problem by trying "to keep him more active." The trial court heard evidence, however, that J.A.R.R.'s weight improved after he was removed from Father's custody.

Miller also testified that J.A.R.R. had told her that he was the primary caregiver for his younger siblings, J.N.R. and M.A.R., before the children were removed. The trial court could have properly considered this evidence of "parentification" of J.A.R.R. in determining whether Father knowingly placed or knowingly allowed the children to remain in conditions that endangered their physical or emotional well-being. *See In re V.G.*, No. 04-08-00522-CV, 2009 WL 2767040, at *3,

*8 (Tex. App.—San Antonio Aug. 31, 2009, no pet.) (mem. op.), *superseded by statute on other grounds*.

The parents' therapist, Caylor, testified that Father told her he knew the Department had become involved with the family because J.N.R. had "a lot of special needs, a lot of medical appointments were missed," J.A.R.R. was "so overweight," and M.A.R. "was failure to thrive." She also testified, however, that Father believed it was not his fault the Department was involved with his family. Similarly, Miller testified that at the time of the children's removal, both Father and Mother were argumentative with her, did not believe the children's removal was necessary, and believed they were meeting the children's needs. She testified that Father and Mother told her the children were only hospitalized because the Department had mandated it and that doctors had told them the children were fine "and there were no issues." Miller concluded that Father and Mother "just, overall, did not appear to understand the severity of the allegations and what led to the removal." She also testified that she had not seen any change in Father's attitude on these points since the children's removal, noting, "He continues to be argumentative. He continues to refuse to accept blame on himself. He continues to try to place blame on others. It is a conversation that we have had multiple visits, multiple times, about him blaming CPS and blaming doctors, just overall lack of accountability."

Based on this evidence, a reasonable trier of fact could have found that the children's pre-removal environment was a source of endangerment to their physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re T.M.T.*, 2018 WL 6053667, at *10–11; *see also In re J.O.A.*, 283 S.W.3d at 344. Additionally, the disputed or conflicting evidence is not so contrary to that finding that it would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, the evidence is legally

and factually sufficient to support the trial court's finding under Texas Family Code section 161.001(b)(1)(D).

We overrule Father's first issue.

*Best Interest*

*Applicable Law*

In his second issue, Father challenges the trial court's finding that termination of his parental rights is in the children's best interest. There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d at 97. To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[2] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has used a similar list of factors[3] to determine a child's best interest. TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

---

[2] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[3] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by his past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

*Application*

With regard to both J.N.R. and M.A.R., Miller testified that Father was not able to articulate a full understanding of the children's medical needs and how to meet those needs, despite multiple conversations. *See In re T.M.T.*, 2018 WL 6053667, at *13 (considering parent's ability to meet child's medical needs in best interest analysis); *see also* TEX. FAM. CODE § 263.307(b)(12) (factfinder may consider whether child's family demonstrates adequate parenting skills, including the parent's provision of "minimally adequate health and nutritional care"). She also noted that during this case, Father and Mother moved from San Antonio to Carrizo Springs, more than two hours away from J.N.R.'s established medical providers. Caylor testified that Father and Mother do not have a plan for how to meet J.N.R.'s medical needs in Carrizo Springs and that they did not develop a support system to help them if the children are returned home. *See* TEX. FAM. CODE § 263.307(b)(13). While Father testified that he has family support in Carrizo Springs, Miller

testified that support "is from people who may not have a full understanding of what caring for [J.N.R.] on a day-to-day basis would entail."

Miller testified that Father's and Mother's visits with the children were appropriate "[f]or the most part," but she explained that she had observed some visits where she had concerns about the parents' level of interaction with the children. For example, she testified that during visits with M.A.R., Father and Mother "have left him in the stroller for upwards of 45 minutes, even though he was awake and alert. . . . I have observed him running around visitation areas and the parents are ignoring him or not interacting with him." *See id.* § 263.307(b)(12)(B), (C) (factfinder may consider whether parents provide child with "care, nurturance, and appropriate discipline consistent with the child's physical and psychological development" and "guidance and supervision consistent with the child's safety"). She also testified that during virtual visits with J.N.R.,[4] Father and Mother "put in very minimal effort. During the visits that I supervised, there would be long stretches of silence. There would be instances where neither parent was actually interacting with J.N.R." *See id.* § 263.307(b)(12)(B). She noted that Father, in particular, was looking off camera, "not even focused on his daughter" and that at times during the visits, "both parents appeared to be at work, and therefore focused on their work activities, instead of interacting with [J.N.R.]." *See id.* While Miller agreed that virtual visits with a child of J.N.R.'s age can be difficult, she noted Father and Mother did not try to overcome those difficulties by, for example, trying to sing to J.N.R. or read her a book.

The evidence is essentially undisputed that Father's relationship with J.A.R.R. has deteriorated throughout this case. Miller testified that Father made disparaging comments to J.A.R.R. during visits and that "[J.A.R.R.] felt bullied by his father. . . . [he] just felt, because of

---

[4] While Father and Mother visited J.A.R.R. and M.A.R. in person, their visits with J.N.R. were virtual due to the COVID-19 pandemic and J.N.R.'s medical needs.

these comments, because of the way his dad was acting, he didn't want to have any further contact." The evidence further shows that J.A.R.R. "does not want to have a relationship with his father at this point in his life," and Aunt testified J.A.R.R. chose to stop visiting his parents after "he got into an argument with [Father]." While J.A.R.R. initially voiced a desire to go home to his parents, Miller testified:

> He has expressed his desires pretty consistently over the last six to seven months, specifically that he does not feel safe going home. He states that he does not believe his parents have made behavioral changes. He is scared that, if he goes home, he will once again resume the role of primary caregiver for his siblings.

See TEX. FAM. CODE § 263.307(b)(5) (factfinder may consider child's fear of returning home). The evidence shows that J.A.R.R. "has made it very clear that he does not wish to go home, that he is wanting to stay and be adopted by the placement that he is at." See Holley, 544 S.W.2d at 371–72. Aunt confirmed that she knows J.A.R.R. wants her and Uncle to adopt him, and she stated that they are willing to do so. See id. While Father testified that he had not "been told why" J.A.R.R. did not want to visit with him, he did not dispute any of Miller's or Aunt's testimony on this point.

Additionally, the evidence shows that when J.A.R.R. came into care, he had behavioral and hygiene issues and suffered from nightmares. Miller testified J.A.R.R. "would destroy the foster family's belongings, he would hit things and he would hide the things that he had broken or destroyed." Miller testified that those issues have resolved since J.A.R.R.'s removal from his parents. She also testified that J.A.R.R. has lost a significant amount of weight, "is almost completely off of junk food" and "is very active."

Miller testified that she did not believe Father "has taken accountability for his actions or to recognize the role that he has played" in the children's removal and has "continued to deflect blame onto others throughout this case." See In re D.W., 445 S.W.3d 913, 927 (Tex. App.—Dallas 2014, pet. denied) (considering evidence that parent "blamed everybody else for the children's

removal from her care and did not take any responsibility for her actions"). She also stated that Father appeared to put most of the parenting burden on Mother and "has made it very clear that he has no intent on meeting the sanitary needs of his child, as he does not believe that that is what a man should do, i.e., changing diapers, changing catheters, bathing." While Father testified that he had changed J.N.R.'s diapers in the past, he stated that his upbringing and his past work in a nursing home "took [him] into the perspective of . . . . a girl's going to change a girl, instead of a guy going and changing a girl. I just don't see that, as a guy, going and seeing somebody . . . completely naked." Based on these statements, Miller concluded, "I don't believe that he would be a parent to these children" if they returned home. As noted above, moreover, the trial court also heard evidence that J.A.R.R. acted as his siblings' primary caregiver before the children were removed.

Miller also testified that Father and Mother do not have an appropriate care plan prepared for the event of the children's return. *See Holley*, 544 S.W.2d at 371–72 (factfinder may consider parent's plans for the child). She testified that the parents' plan is for one parent to work overnights and the other to work days, which would mean that only one parent would be with the children at a time. Because two of the three children are still in diapers, Miller did not believe this plan was workable due to Father's assertion that he will "not bathe, nor change his children, as that is not a man's job . . . [the parents' plan] leaves me very concerned that, if [Father] were to have the children during the day, that they would just not be cleaned properly." While Father told Miller that he "would transport the children to his mother's home, in order to have his mother change the diapers or bathe them, if necessary," Miller did not believe this solution was appropriate "as that would leave these children to sit in soiled diapers and filth for an unknown amount of time." *See* TEX. FAM. CODE § 263.307(b)(1) (factfinder may consider child's age and physical vulnerabilities); *id.* § 263.307(b)(12).

The evidence shows that J.A.R.R. and M.A.R. are doing well in their placement with Uncle and Aunt. While J.N.R. was not placed with Uncle and Aunt at the time of trial due to her medical needs, Uncle and Aunt were working toward obtaining the certification that would allow them to take custody of her. Aunt testified that she and her husband are willing to adopt all three children. She also testified that while they are the children's maternal relatives, they are making efforts to foster the children's relationship with their older half-brother—who is Father's son from another relationship—and with their paternal grandmother.

In his brief, Father notes that the Department initially planned to seek the appointment of Father and Mother as possessory conservators rather than terminating their parental rights entirely. Miller testified that this plan changed because by the time this case went to trial, she did not believe possessory conservatorship for Father was in the children's best interest. This is primarily due to the nature of Father's relationship with the boys' current caregivers, Uncle and Aunt. Miller testified that both parents blame Uncle and Aunt for the children's removal, and she stated that she believes Father "will put his relationship with the caregivers above all else." *See In re D.W.*, 445 S.W.3d at 927–28 (considering evidence that parent "put her own needs before the children's needs"). She noted that Father wanted J.A.R.R. to stay in a shelter instead of moving into Uncle and Aunt's home because "[Father] just didn't want to have any interactions" with Uncle and Aunt. *See id.* She explained that the Department initially hoped to have off-site visits and increase collaboration between the caregivers and the parents, but that did not happen because Mother and Father "declined. . . . They didn't want to have any type of communication with the aunt and uncle. They were very, very much against placement of the children with the aunt and uncle." *See id.* Miller also stated that Father makes no effort to reach out to Uncle and Aunt to check on the children, and Aunt testified that she invited Father and Mother to J.A.R.R.'s birthday party but "never got a response back." While Father testified this lack of communication was because he

did not have a phone number for Uncle and Aunt, he agreed that Mother had the phone number, and Miller testified that she gave the phone number to Father. Miller testified that she did not believe Father and Mother would "make a significant effort to continue to foster a relationship" with the children's current caregivers if they were granted possessory conservatorship.

Based on this evidence, a reasonable trier of fact could have found that termination of Father's parental rights was in the children's best interest. *See* TEX. FAM. CODE § 263.307(b); *Holley*, 544 S.W.2d at 371–72; *see also In re J.O.A.*, 283 S.W.3d at 344. Additionally, the disputed or conflicting evidence is not so contrary to that finding that it would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, the evidence is legally and factually sufficient to support the trial court's best interest finding. *See id.* at 344–45.

We overrule Father's second issue.

### *Mother's Appeal*

In a single issue, Mother challenges the legal and factual sufficiency of the trial court's finding that termination of her parental rights is in the children's best interest. Mother does not challenge the trial court's finding that she "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(D). Accordingly, we may treat that finding as probative on the issue of best interest. *In re C.H.*, 89 S.W.3d at 28; *see also In re E.D.*, 419 S.W.3d at 620 (factfinder may judge parent's future conduct by past conduct).

Much of the evidence described above in the discussion of Father's best interest challenge also applies to Mother. For example, the evidence shows that Mother, like Father, did not learn how to properly care for J.N.R.'s G-tube or ensure that J.N.R. attended necessary medical appointments. *See In re T.M.T.*, 2018 WL 6053667, at *13; *Holley*, 544 S.W.2d at 371–72

(factfinder may consider acts or omissions of the parent). Furthermore, Mother herself testified that she did not seek immediate medical attention when J.N.R.'s G-tube started leaking, even though she had been told that she needed to do so. *See In re T.M.T.*, 2018 WL 6053667, at \*13. Mother also testified that she knew J.N.R. had gone without a medically necessary spinal surgery for at least two years, a delay she attributed to communication difficulties with the doctor's office and the family's medical insurance. She agreed that the "three [or] four" phone calls she had made in trying to resolve these issues were "not sufficient enough" to meet J.N.R.'s needs. *See id.* The trial court could have considered this evidence in determining whether Mother had the necessary parenting skills to provide the children with "minimally adequate health and nutritional care." TEX. FAM. CODE § 263.307(b)(12)(A).

As noted above, Miller testified that she did not believe either parent understood the severity of the children's condition at the time of their removal, and she noted that both parents had expressed to her that they thought the children were fine. Additionally, both Miller and Caylor testified that Mother did not take responsibility for the conditions that led to the children's removal. *See In re D.W.*, 445 S.W.3d at 927. And, as with Father, Miller testified that she had not seen any change in Mother's attitude on these points. *See* TEX. FAM. CODE § 263.307(b)(11) (factfinder may consider parent's willingness and ability to effect positive environmental and personal changes). While Mother testified at trial that she now understands that learning about J.N.R.'s conditions and care will "be a life-long commitment" and stated that she will be "more attentive" and more aware of what to do "if symptoms arise or something out of the ordinary" in the future, the trial court was not required to credit this testimony. *See, e.g.*, *In re H.D.*, No. 01-12-00007-CV, 2013 WL 1928799, at \*15 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). Furthermore, the trial court was permitted to consider Mother's past conduct in determining whether to credit this testimony. *See In re E.D.*, 419 S.W.3d at 620.

The evidence also shows that J.A.R.R. told Miller that when Mother and Father had custody of the children, Mother "would sleep all day" and "he wasn't being taken care of, they would only eat fast-food [and] he wasn't going to school consistently." *See* TEX. FAM. CODE § 263.307(b)(12). Miller stated that J.A.R.R. has told her "that he felt he wasn't being cared for" and he is afraid of going home for reasons that are related to the removal allegations. *See id.* § 263.307(b)(5).

Miller testified that she did not believe it was feasible to reunite the children with Mother because she did not believe Mother "has made significant progress in addressing the reasons why the Department became involved, initially. I don't believe that she has a full understanding of [J.N.R.'s] medical needs and how to properly meet those needs." *See In re T.M.T.*, 2018 WL 6053667, at *13. While Mother argues on appeal that "[t]he parents only need to be educated" about their children's needs, the record shows that the children were removed in May of 2020, this case first went to trial in September of 2021, and the trial concluded in January of 2022. Miller testified that she did not "believe that [Mother] made enough of an effort to learn about [the children's] medical needs or change her own lifestyle, in order to accommodate those needs" during that time. *See id.*; *see also* TEX. FAM. CODE § 263.307(b)(11). Additionally, while Mother argues that the Department "made no significant efforts to work with [her] and help her obtain the knowledge necessary to care for the children regarding their medical needs," Miller testified that she: (1) frequently reminded Father and Mother of the children's medical appointments; (2) encouraged them "to reach out to the medical providers on their own time and gain a better understanding"; (3) "strongly encouraged" them to participate in any trainings offered by the medical providers and "to talk to the doctors, to talk to the staff"; and (3) sent them copies of "packets that were printed out, that had all upcoming medical appointments."

Mother argues that termination is not in the children's best interest under these circumstances because "an option short of termination is workable." She contends the trial court should have granted managing conservatorship to Uncle and Aunt and possessory conservatorship to Father and Mother while the Department "continu[es] to work with [Mother] for reunification and to address specialized problems of the children." We note, however, that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). Furthermore, in reviewing a trial court's determination of a child's best interest, we must be mindful that "[s]tability and permanence are paramount in the upbringing of children." *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Here, as was the case with Father, Miller testified that she did not believe possessory conservatorship for Mother was in the children's best interest because she did not believe Mother:

> would maintain a civil or cordial relationship enough with the caregiver, in order to take advantage of any possessory rights that we were to grant her. I believe that she would let her personal feelings towards that caregiver get in the way of a relationship with her children, as she has already demonstrated since placement.

*See In re E.D.*, 419 S.W.3d at 620. Mother herself agreed that even though J.A.R.R. was in a shelter before he was placed with Uncle and Aunt, she was not in favor of moving J.A.R.R. and M.A.R. into Uncle and Aunt's home because she "wasn't sure if, when something happened—something happens regarding the children, if I was going to be told or not of whatever would happen." *See In re D.W.*, 445 S.W.3d at 927–28. While Mother testified that she believed she and Father could mend their relationship with Uncle and Aunt and work more cooperatively with them in the future, we may not credit that testimony where, as here, it appears the trial court did not. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d at 346.

Based on this evidence, a reasonable trier of fact could have found that termination of Mother's parental rights was in the children's best interest. *See* TEX. FAM. CODE § 263.307(b); *Holley*, 544 S.W.2d at 371–72; *see also In re J.O.A.*, 283 S.W.3d at 344. Additionally, the disputed or conflicting evidence is not so contrary to that finding that it would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding under Texas Family Code section 161.001(b)(1)(D). *See id.* at 344–45.

We overrule Mother's sole issue.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice