

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00634-CV

**IN THE INTEREST OF A.C.** and A.S.L.C., Children

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-02031
Honorable Charles Montemayor, Judge Presiding

Opinion by:    Lori Massey Brissette, Justice

Sitting:    Lori Massey Brissette, Justice
Adrian A. Spears II, Justice
H. Todd McCray, Justice

Delivered and Filed: February 5, 2025

AFFIRMED

This case involves the termination of a mother's right to parent her two children who, at the time of the final hearing, were three years old and twenty-three months old.[1] Mother appeals the trial court's order terminating her parental rights, challenging the sufficiency of the evidence supporting the trial court's finding that termination is in the best interest of the children. We affirm the trial court's order.

---

[1] We will refer to the children individually as "oldest child" and "youngest child" to protect the identity of the children. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8.

**PROCEDURAL FACTS**

The Department of Family and Protective Services removed the children from Mother's care on December 23, 2022 and filed an Original Petition for Protection of Child, for Conservatorship, and for Termination in Suit Affecting Parent Child Relationship on December 27, 2022. Soon after, the Department was granted temporary conservatorship. At the sixty-day hearing, Mother was presented with and signed a family service plan which indicated her understanding of the requirements set forth therein and the ramifications for her failure to do so. Four permanency hearings were held and Mother was present at all hearings. On June 14, 2024, almost eighteen months after removal[2] and just a week prior to the deadline on which the case would be dismissed, the trial court held a final hearing. Five witnesses testified, including a psychiatrist, therapist, the investigative and legal caseworkers, and the father of the youngest child ("Father").

After hearing evidence, the trial court terminated Mother's parental rights based on Texas Family Code Section 161.001(b)(1)(D), (N), and (O) and found termination was in the best interest of the children as required by Texas Family Code Section 161.001(b)(2). *See* TEX. FAM. CODE § 161.001(b). The court granted temporary conservatorship of the oldest child to the Department and granted sole managing conservatorship of the youngest child to Father. On appeal, Mother challenges only the finding that termination of her rights is in the best interest of the children.

---

[2] The trial court granted an extension of the deadline for determination of the case to June 22, 2024 to allow the father of the youngest child to demonstrate the ability to care for the youngest child. TEX. FAM. CODE ANN. § 263.401(b).

### BACKGROUND FACTS

**Removal**

At the time of removal, the oldest child was under two years of age and the youngest child was just under six months old. Mother and the children were living with the children's maternal grandmother in conditions the Department asserted endangered their physical and emotional well-being. Specifically, the investigative caseworker testified and provided photographic evidence of the unsanitary condition of the home in which Mother and the children were living. She stated the home had a foul odor of urine and feces, a leak in the bathroom, piles of dishes, mold in the refrigerator and a roach infestation. The oldest child had knotted hair embedded with lice and other, larger bugs. The youngest child had a skin infection with visible sores and scabs covering legs, arms, head, and torso. While it appeared ointment had been applied to the skin of the youngest child, it was "caked on."

At the time of removal, Mother excused the condition of the home due to her working schedule. She stated she was treating both the oldest child's lice and the youngest child's skin condition. Although she had taken them to the doctor on November 1, 2022, she chose to use an over-the-counter ointment like Neosporin because she stated the pharmacy would not provide the medication prescribed by the doctor. By the date of removal, December 23, 2022, both conditions warranted more serious medical treatment. The oldest child was given oral medication in addition to topical lice treatment and the youngest child was admitted to the hospital due to the skin infection. According to the Department, Mother never acknowledged her role in the neglect of her children's medical and physical needs.

**Plan of Service**

Mother was provided a plan of service, which she signed evidencing her understanding of the requirements. She was asked to maintain stable employment and stable housing, and demonstrate an ability to provide a safe, clean, and appropriate space for her children. She was required to attend parenting classes, a domestic violence class, undergo a psychiatric evaluation, and follow all related recommendations. Initially, the permanency goal set forth in February of 2023 was reunification with Mother. But, by June of 2023, the permanency goal was changed from reunification to finding alternative placement for the children. The caseworker testified at trial that Mother was unsuccessfully discharged from parenting classes, domestic violence classes and counseling before she was eventually able—later in the case—to complete a psychiatric evaluation, a parenting class, and a domestic violence class.

**Mental Health Issues**

At trial, the psychiatrist who evaluated Mother as part of her service plan testified she was diagnosed with Bipolar 1 Disorder, generalized anxiety disorder and severe post-traumatic stress disorder. He recommended follow up psychiatric services and explained that, given the seriousness of her diagnosis, ongoing treatment would be necessary.

Mother's therapist, also appointed per the service plan, testified that Mother started therapy in June of 2023 but was unsuccessfully discharged by the end of September of 2023 due to excessive absences and a lack of engagement.

The caseworker stated Mother failed to follow through on recommended counseling and psychiatric treatment, even when the caseworker sat with her on the phone to complete the initial intake and set up an appointment for her to see a psychiatrist that same day, which Mother chose not to attend. Mother admitted to the caseworker she understood the need for medication given her

Bipolar 1 diagnosis. But, she never provided any proof of a prescription or that she was actively taking medication.

**Need for Stable Housing and Employment**

The caseworker further testified Mother failed to demonstrate an ability to maintain stable housing and employment, reporting a number of moves and job changes throughout the eighteen months the case was pending. In that time, Mother lived with her own mother, with friends, and then with a boyfriend. While she was living with a boyfriend, the caseworker visited the home to find it messy, cluttered with trash, with visible dog urine and feces on the floor, and minimal to no food in the refrigerator. Once Mother moved back in with her own mother, she did not allow the caseworker an opportunity to visit the home, canceling three visits at the last minute for various reasons and refusing a fourth request.

**Visits with Mother**

Through the pendency of the case, Mother had the opportunity to visit the children for one hour every other week. Because of her failure to meet the requirements of the family service plan, the frequency of visits was never increased. The caseworker testified she explained to Mother why visits were not increasing and what Mother needed to do in order to see progress.

According to the caseworker, outside of visits, the oldest child is playful, active, smart, talkative/chatty, silly – very happy. But during visits, "she's kind of just there. Mother takes a lot of pictures with the children. But, mostly, Mom just puts on a video and that's really it." The caseworker spoke with Mom about the lack of engagement during visits. However, Mother did not see an issue with her conduct.

During visits Mother would leave the youngest child in the carrier "pretty much the entire visit until it was time to take a photo." The caseworker noted the lack of a bond between the

youngest child and Mother. In fact, the caseworker testified that Mother offered to willingly relinquish her rights to the youngest child in exchange for maintaining her parental rights relating to the oldest child.

After visits, the caseworker testified that it would take two to three days for the oldest child to resume her normal state, during which she would experience sleeping issues, nightmares, and cries for attention.

**New Placements**

The caseworker testified the oldest child is in a foster-to-adopt home, noting it to be a safe and stable placement meeting her therapeutic needs. Specifically, at the time of removal, the oldest child struggled with emotional regulation, sometimes physically injuring herself to get attention, including banging her head against the floor or wall. Now that she is in a foster-to-adopt home, she has not banged her head for attention in over a year. She is bonded to foster mom who continuously engages with her and who is her source of comfort when she's upset, angry, or sad.

The father of the youngest child was notified of the removal from Mother's home and expressed interest in caring for the youngest child. He testified he had raised concerns to Mother about the children and asked to be more involved prior to the removal. He voluntarily admitted paternity, despite there being another presumed father (Mother's husband), and completed all services required by the Department, including establishing an appropriate home and sleeping arrangement for the child as well as proving he can financially care for the child. He started visitation with the child in February of 2023 and was granted possession of the child seven weeks before trial. In his care, the youngest child's skin condition has dramatically improved. Father testified he also suffers with eczema and knows to apply cream to the baby's skin after every bath to keep it moisturized. He uses the doctor-prescribed ointment. The caseworker testified that while

there are still flare-ups of the eczema, Father treats it appropriately and the condition quickly resolves with the proper care. While the youngest child has some development delays, specifically with speech, Father has set up services to address them. Father was also able to demonstrate his ability to provide safe and stable housing and stable employment to meet the needs of the child.

**Trial Court Findings**

The trial court, after noting that "Mom's story is incredibly sad, incredibly tragic," terminated Mother's rights to both children under Texas Family Code section 161.001(b)(1)(D), (N), and (O) and found the termination in the best interest of both children.

## BEST INTEREST OF THE CHILDREN

Mother argues the evidence was legally and factually insufficient to support the trial court's finding it was in the best interest of the children to terminate her parental rights. We disagree.

**Standard of Review**

It is of constitutional importance when a trial court involuntarily terminates a natural parent's rights. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App. – San Antonio 2017, pet. denied). But those rights "are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A parent-child relationship may be terminated, pursuant to Texas Family Code section 161.001, only if the trial court finds by clear and convincing evidence one predicate ground enumerated in subsection (b)(1) and termination is in a child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *see, e.g.*, *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and

convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

An appellate court reviewing the legal sufficiency of the evidence cannot apply "our traditional legal sufficiency standard, which upholds a finding supported by '[a]nything more than a scintilla of evidence.'" *In re J.F.C.*, 96 S.W.3d 256, 264–65 (Tex. 2002). This "is inadequate" under the United States Constitution, which demands evidence be "clear and convincing"; nor would it afford the protections of that higher standard of proof. *Id.* at 265 ("Requiring only '[a]nything more than' a mere scintilla of evidence does not equate to clear and convincing evidence." (alteration in original)). Our legal sufficiency review, therefore, must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266; *see C.E.*, 687 S.W.3d at 308 (stating same, citing *J.F.C.*). This means we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. We are also required to "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* But we do not disregard undisputed facts that do not support the finding as this would distort our legal sufficiency review. *Id.*

The difference between our legal and factual sufficiency reviews when the burden of proof is clear and convincing evidence is small, "but there is a distinction in how the evidence is reviewed." *Id.* at 266. For factual sufficiency, we place an even keener eye on the evidence contrary to the finding, determining whether "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*; *see, e.g.*, *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (same, quoting *J.F.C.*).

**Applicable Law**

Under Texas law, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a trial court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27–29.

The Texas legislature codified certain factors to use in determining the best interest of a child, including:

(1)     the child's age and physical and mental vulnerabilities;

(2)     the frequency and nature of out-of-home placements;

(3)     the magnitude, frequency, and circumstances of the harm to the child;

(4)     whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5)     whether the child is fearful of living in or returning to the child's home;

(6)     the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A)    minimally adequate health and nutritional care;

(B)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C)    guidance and supervision consistent with the child's safety;

(D)    a safe physical home environment;

(E)    protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F)    an understanding of the child's needs and capabilities; and

(13)    whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307(b); *see In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018) (recognizing statutory factors as additional factors for consideration). Even before the legislature took action to codify section 263.307(b), the Texas Supreme Court, in *Holley v. Adams*, identified factors to determine the best interest of a child:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

544 S.W.2d 367, 371–72 (Tex. 1976).

The Department does not have to prove every factor for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. In our review of the trial court's best-interest findings, we must consider "the totality of the circumstances" in light of these factors to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.). Additionally, "[a] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

## ANALYSIS

Here, Mother contends the trial court failed to apply the *Holley* factors and did not have sufficient evidentiary support for a finding that termination was in the best interest of the children. We disagree.

**The Children's Needs and Desires**

When children are too young to express their desires like the children here, the factfinder may consider whether the child has bonded with caregivers, is well-cared for by them, and has spent minimal time with a parent. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL 650450, at *6 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.). The oldest child is bonded with her foster mom. The actions of the children demonstrate that they are happy, calm and supported in their new placement. The caseworker noted the lack of engagement with Mother during visits and testified that it took several days after each visit with Mother for the oldest child

to resume the ability to regulate her emotions. The caseworker identified both children turning to their new placements for comfort and engagement. Of particular note is the oldest child's previous habit of banging her head to get attention and the fact that such conduct has ceased in her new placement. As well, the youngest child's skin condition and speech delays demand attention, which Mother struggled with and Father has proven he can provide. *See* TEX. FAM. CODE § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72 (factors (A)–(C)).

Like every child, these children need a clean, safe place to live, and they need someone to take care of their personal hygiene. The evidence demonstrated that both children, in the care of Mother, were not having those needs met and, even further, that Mother was unable to meet them. The caseworker even testified Mother gave no indication that she acknowledged changes that she needs to make to meet the needs of her children. *See* TEX. FAM. CODE § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72 (factors (C)–(D)).

**The Emotional and Physical Danger to the Children and Circumstances of Removal**

This is the second investigation into Mother's care of the children, but it is the first that warranted removal of the children from her care. The circumstances of the children at the time of removal, including their living environment and their physical condition were severe, with the youngest child being admitted to the hospital for several days. The fact that the children have thrived in their new placements and have not been the victim of repeated harm after the Department's intervention indicates their interests are being served well by those caring for them in Mother's stead and the danger posed to them in the care of Mother. *See* FAM. CODE § 263.307(b) (2), (3), and (4); *Holley*, 544 S.W.2d at 371–72 (factors (A)–(C)).

**Mother's Condition and Parental Abilities**

Mother has been diagnosed with Bipolar 1 Disorder, generalized anxiety disorder, and severe post-traumatic stress disorder, but she has not sought to address her own needs relating to those conditions. Although she completed a psychiatric evaluation, she did not follow through on the recommendations made by the psychiatrist to engage in ongoing counseling and seek psychotropic medication, even when the caseworker helped her complete an initial intake and set a follow up appointment that same day.

Mother has further been unable to demonstrate her ability to meet the needs of the children in terms of maintaining a safe, clean place to live and has actively shown a pattern of moving and changing jobs. *See* TEX. FAM. CODE § 263.307(b)(6), (10)–(12); *Holley*, 544 S.W.2d at 371–72 (factor (G)). The caseworker also testified Mother was unsuccessfully discharged from parenting classes and domestic violence classes, before she eventually completed a parenting class and a domestic violence class.[3] And while there is no evidence that Mother had a substance abuse problem or was physically abusive to the children, there is strong evidence of physical and medical neglect. And, the caseworker noted Mother's inability to see her own accountability relating to the reasons for removal or the behaviors she needs to address. The parent-child visits further demonstrated that Mother was not cognizant of a need to interact with and meet the needs of her children, even for short increments of time. *See* TEX. FAM. CODE § 263.307(b)(11)–(12); *Holley*, 544 S.W.2d at 371–72 (factors (C) and (D)).

**Quality of New Placements**

Here, the oldest child is in a foster-to-adopt home that is, by all accounts, meeting her physical and emotional needs. The child has ceased behaviors that were self-harming and is

---

[3] Trial testimony showed there was at least one incidence of domestic violence.

described as active, talkative and silly in her new environment, in stark contrast to her demeanor after visits with Mother. The youngest child, too, is thriving with Father both physically and emotionally, with Father adept at treating the child's skin condition and seeking to address the speech delay. Finally, both the foster-to-adopt mom and Father have expressed an intent to maintain the bond between the siblings going forward. *See Holley*, 544 S.W.2d at 371–72 (factors (D)–(G)).

**Summary**

Here, applying our standard of review for legal sufficiency and viewing the evidence in a light favorable to the trial court's findings, and given that we can only go on the conduct of the Mother to date, we conclude the trial court could have reasonably formed a firm belief or conviction termination of Mother's parental rights was in the best interest of her children. *See R.R.A.*, 687 S.W.3d at 276; *In re J.O.H.*, 617 S.W.3d 596, 599 (Tex. App.—San Antonio 2020, no pet.) (holding that, in considering child's best interest, parent's future conduct may be judged by past conduct). Turning to factual sufficiency, we further conclude that when viewing the entire record, any evidence contrary to the finding is not significant that it would prevent a reasonable factfinder from forming the same firm belief or conviction termination was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266.

The record before us therefore demonstrates sufficient evidence to support the trial court's finding that termination is in the best interest of the children. *See* TEX. FAM. CODE § 161.001(b)(2). Just as the trial court stated when terminating Mother's parental rights, "As sad as it is, as sad as the circumstances of Mom [are], the only thing sadder than that circumstance is saddling [the children] with that legacy and that cycle." While we hope Mother's future conduct bodes

differently and well, we can only look to what was presented before us on this record as to her current ability to meet the best interest of the children.

## CONCLUSION

We affirm the trial court's order.

Lori Massey Brissette, Justice